Filed 8/20/20  P. v. Villa CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B293118 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA292983) |
| v. | |
| RUBEN VILLA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Larry P. Fidler, Judge.  Affirmed in part and remanded in part with directions.

Leslie Conrad, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Scott A. Taryle and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

_____

After shooting and killing Matthew Simms, Ruben Villa was convicted of voluntary manslaughter, assault by means likely to produce great bodily injury, shooting at an occupied vehicle and possession of a firearm by a felon. The jury also found true firearm enhancement allegations. Villa was sentenced to an aggregate indeterminate state prison term of 33 years to life. On appeal Villa contends the trial court committed prejudicial error by permitting the People to introduce speculative and irrelevant testimony and allowing the jury to see improper notations on the transcript of a witness's police interview. He also argues the court abused its discretion in declining to strike the firearm enhancement imposed pursuant to Penal Code section 12022.53, subdivision (d),[1] and his sentence constitutes cruel and/or unusual punishment. We affirm Villa's convictions and reject his arguments concerning imposition of the firearm enhancement and the constitutional validity of his sentence, but nonetheless remand for resentencing to permit the trial court to exercise its sentencing discretion after striking the one-year prior prison term enhancement imposed pursuant to section 667.5, subdivision (b).

**FACTUAL AND PROCEDURAL BACKGROUND**

1. *The Information, First Trial and Amended Charges*

Villa was originally charged by information with the murder of Simms (count 1), possession of a firearm by a felon (count 2) and assault by means likely to produce great bodily injury on Amanda Alvarez (count 3). Firearm enhancements were alleged as to counts 1 and 3. It was further alleged that Villa had served

_____

[1] Statutory references are to this code unless otherwise stated.

2

two prior prison terms for felonies within the meaning of section 667.5, subdivision (b). A jury convicted Villa of unlawful possession of a firearm but was unable to reach a verdict on the other two charges. Prior to retrial on the murder and aggravated assault counts, the prosecutor added a charge of shooting at an occupied motor vehicle (count 4) with additional firearm-use allegations under sections 12022.53, subdivisions (b), (c) and (d).

### 2. *Villa's Second Trial*

#### a. *The People's evidence*

Simms had been dating Alvarez for two or three years.[2] During that time, Alvarez also became romantically involved with Villa. Alvarez's relationship with Villa angered Simms, and Simms periodically asked her if she was still seeing Villa.

Alvarez's best friend, Noelle Jensen, lived across the street from Villa in El Sereno. Alvarez and Jensen got together almost every day to smoke methamphetamine. Because Alvarez did not have a car, Simms dropped Alvarez off and picked her up at Jensen's house.

On October 23, 2005 Jensen heard Villa outside her house screaming at Simms. Villa yelled, "I told you not to come back up here. . . . Don't come back up here, disrespect." Alvarez and Jensen went outside; and Alvarez began cursing at Villa, who was with another man. Jensen told Alvarez to "shut the fuck up." When asked why she had said that, Jensen explained she was

---

[2]     Both Villa and the Attorney General adopt the description of the evidence presented at Villa's second trial from our nonpublished opinion in the People's earlier appeal in the case. (*People v. Villa* (Aug. 14, 2017, B269082).) We do so as well, supplemented by greater detail concerning the testimony at issue in the current appeal.

concerned that, "by her talking shit to [Villa], all it's going to do is make him mad"—that Alvarez's outburst would just make matters worse. After Jensen answered the question, defense counsel objected on relevancy grounds, insisting, "It's irrelevant why she did something." The court responded, "Well, no, because it explains her state of mind and explains why she acted the way she did, so that's the reason it will be received."[3]

On redirect Jensen elaborated that she told Alvarez to shut up because Villa's friend looked "like a homeboy," "like somebody from a gang," and Alvarez was making Villa look bad in front of him. Defense counsel objected that the question, already answered, called for speculation. The court overruled the objection, "It was why she did something." Continuing, Jensen said she had seen people involved in gang culture react with violence to "save face." Alvarez also testified over a defense objection on relevancy grounds that she was concerned about "what was going on" after Jensen told her to shut up and go inside.

The following day Simms dropped Alvarez at Jensen's house. Because Alvarez was planning to stay only about 15 minutes, Simms stopped his car in front of Villa's house. The driver's side of the car faced Villa's house. Alvarez noticed Villa outside, talking to the occupants of another car that was stopped in the street. When Villa saw Alvarez and Simms, he went into his house.

---

[3]    The prosecutor attempted to follow up, asking, "How does it make matters worse?" Defense counsel again objected. The court sustained this objection: "She already indicated that's where her thought process was, which is the only relevant thing, so sustained."

Jensen came outside to talk to Simms. Suddenly, she saw Villa leaving his yard, holding a gun, and heard him say, "I told you not to come up here." Alvarez saw Villa holding a gun, running out of his driveway toward Simms's car.

Villa fired several shots through the driver's side window of Simms's car. The car began to roll down the street. Alvarez and Jensen saw and/or heard Villa fire a few more shots through the back window of the car as it rolled down the street. Alvarez asked Villa what he was doing. He told her to shut up and said the shooting was her fault for letting Simms disrespect him.

According to Jensen, Villa pointed his gun at Alvarez's head and said he should shoot her too. He then tucked his gun inside his pants and ran over to Simms's car before returning to his house and driving away in his father's truck.

When the shooting occurred, Jensen's boyfriend, Art Estevez, was in the driveway of her house, working on stolen vehicles parked in the driveway. He heard several gunshots and dropped to the ground. He then heard five to 10 more gunshots. Estevez saw someone running toward Simms's car, shooting at it. Because he was worried about the police arriving at the scene and discovering the stolen vehicles, Estevez left the area.

Los Angeles Police Officer Ricardo Ortega was the first to arrive at the scene. He found Simms slumped forward in his car, which had crashed into a tree, and observed a bullet wound in Simms's left cheek and blood in the car. The front driver's side window was open; the front passenger's side window was partially open; and the rear passenger windows were closed. All were intact. The rear window and rear wing window on the driver's side were shattered, and there were multiple bullet holes in the car's trunk. Eight shell casings from a semiautomatic handgun

were found at the scene. The casings appeared to be going downhill in a "trail."

Paramedics took Simms, who had gunshot wounds to his face, chest and back, to the hospital. Simms died from a gunshot wound to the chest; the bullet pierced his lung, lacerated a major blood vessel and left his body through his neck. There was no soot or stippling around the gunshot wounds, indicating the muzzle of the gun was more than two feet from Simms when he was shot.

According to Los Angeles Police Department Senior Criminalist Nathan Cross, there were no bullet marks inside Simms's car that could have been caused by someone shooting through the driver's side window. The bullet marks he found were consistent with someone having fired into the car from behind.

b. Defense evidence

Testifying on his own behalf, Villa explained he met Alvarez through Jensen in April 2005. He had a relationship with her for several months. While she told him that she was living with another man and helping him take care of his child, she did not initially tell him the man's name or that he was her boyfriend.

Two weeks after Villa began seeing Alvarez, he had a confrontation with Simms. About 10 minutes after having been picked up by Simms, Alvarez returned and came to see Villa. She was bleeding from her mouth. Alvarez told Villa that Simms had thrown her out of his car and had threatened to kill Villa. While Alvarez and Villa were talking, Simms approached them, pointed a gun at Villa and said something about Villa's relationship with Alvarez. Villa told Simms, "[D]on't come up here"; Alvarez and

6

Simms started arguing; and Alvarez pushed Simms back toward Jensen's house.  Simms later called Villa to apologize, saying it was okay if Alvarez preferred Villa to him.

Villa had another confrontation with Simms when Villa was walking with Alvarez.  Simms drove up, jumped out of his car and approached Villa.  Alvarez got in between the two men and began arguing with Simms.  Villa walked away.

There was also an incident in which Villa was in his front yard and Simms left his car and ran at Villa, holding a machete and threatening to kill him.  Villa's father came out of the house, grabbed a shovel, approached Simms and told him to leave. Simms returned to his car and drove away.

Villa ended his relationship with Alvarez in August 2005. Two months later, on October 23, 2005, Villa was talking to one of his friends by his house when he noticed Simms leaving Jensen's house.  As Simms drove away, he yelled curses at Villa, who yelled curses back at Simms.  Alvarez and Jensen came outside, and Alvarez asked Villa why he was yelling at Simms.  Villa told Alvarez to tell Simms to stop coming there and to stop disrespecting him.

Late the next morning, Villa was waiting for coworkers to pick him up for work.  When they arrived, he berated them for being late and then went inside his house to get his keys.  When he came back out, he saw Simms's car in the middle of the street, facing downhill.  Simms was in the driver's seat; no one else was in the car.  Villa approached the open window of the driver's door and told Simms not to disrespect his family.  Simms pointed a gun at Villa and cursed him.  Villa knocked the gun away as Simms fired a shot out the window.  Villa tried to grab the gun

away from Simms. As the men fought over the gun, it fired again; and Villa ended up with the gun in his hand.

Villa wanted to go back to his house, but he feared Simms would kill him if he tried to do so. Villa testified, "So as all this was happening, like he starts taking off, and just like impulse . . . I shot twice." At that point, Simms's car was about 10 feet away, and "[l]ike my hand just went up and I shot twice." Villa did not intend to kill Simms; he just wanted to protect himself and his family.

Villa remembered that Alvarez was yelling at him and that he probably told her it was all her fault. At that time, he was "all in a daze. Everything happened . . . like real fast."

On cross-examination Villa denied shooting Simms in the face and said he did not see any blood after the first two shots were fired. He denied chasing after Simms's car and continuing to fire at it, but he could not explain how shell casings ended up further down the street in the direction the car had traveled. When he fired at the car, he was not trying to kill Simms; "[i]t was an impulse . . . . I didn't mean to shoot." He fired two shots at Simms as he was driving away.

When the car came to a stop about half a block away, Villa fired five more times. Villa explained, "I am thinking he is going to come out and start shooting at me with another gun. I ran to the side by my driveway, and as soon as that's occurring, just five more went off," meaning five shots were fired "uncontrollably from [his] hand."

After the incident, Villa did not call the 911 emergency operator because he did not trust the police. He took his father's truck and drove away. He disposed of the gun by throwing it in a

8

gutter in El Monte. He did not keep guns around because he was on parole and subject to search at any time.

3. *The Verdict, First Appeal and Sentencing*

The jury found Villa not guilty of murder but guilty of voluntary manslaughter (count 1) with a true finding on a firearm enhancement pursuant to section 12022.5, subdivision (a). It also found Villa guilty of aggravated assault on Alvarez (count 3) and shooting at an occupied motor vehicle (count 4) with true findings on the firearm enhancements alleged as to those counts.

The trial court granted Villa's new trial motion, ruling it had erred in failing to instruct the jury on count 4 on the lesser included offense of grossly negligent discharge of a firearm. The People appealed the new trial order. We reversed, holding the record did not contain substantial evidence Villa had committed the offense of grossly negligent discharge of a firearm but not shooting at an occupied vehicle. (*People v. Villa* (Aug. 14, 2017, B269082) [nonpub. opn.].) We remanded for sentencing.

Villa and the People stipulated there should only be one prior prison enhancement pursuant to section 667.5, subdivision (b), which Villa admitted. The court denied Villa's motion to strike the section 12022.53, subdivision (d), firearm enhancement, noting, "This was a dangerous crime. Besides the fact that multiple gunshots were fired striking [the victim], there is a threat to other society which shows that Mr. Villa just is immune to. He is not worried about it, doesn't care."

The court sentenced Villa to the upper term of seven years for shooting at an occupied motor vehicle, plus 25 years to life for personal discharge of a firearm causing great bodily injury or death, plus one year for the prior prison term enhancement. The

9

court imposed a concurrent term of two years for Villa's unlawful possession of a firearm and stayed the sentences on the voluntary manslaughter and aggravated assault counts pursuant to section 654.[4]  Villa received 3,065 days of custody credits (2,666 actual days, plus 399 conduct days).

## DISCUSSION

1. *The Trial Court Did Not Abuse Its Discretion in Allowing Jensen's Testimony Regarding Her Reason for Telling Alvarez To Shut Up or Alvarez's Reaction to Jensen's Warning*

Villa argues the trial court impermissibly permitted Jensen to testify why she told Alvarez to stop cursing at him and to go back inside the house on the day before the shooting–that she believed it would make Villa even angrier than he already was during a confrontation with Simms–and compounded the error by allowing Alvarez to confirm that she, too, was concerned about

---

[4]    The minute order from the sentencing hearing and the abstract of judgment both incorrectly state a concurrent six-year state prison term was imposed for voluntary manslaughter.  Villa argues, the People concede and we agree the oral pronouncement of judgment ordering the sentence on that count stayed pursuant to section 654 controls.  (See *People v. Farell* (2002) 28 Cal.4th 381, 384, fn. 2 [record of court's oral pronouncement controls over clerk's minute order]; *People v. Mitchell* (2001) 26 Cal.4th 181, 186-187 [appellate court may correct clerical errors on its own motion or upon application of the parties].)  Because we vacate Villa's sentence and remand for resentencing, however, it is not necessary to order the minute order and abstract of judgment corrected.

10

the exchange.  At trial Villa objected only that this testimony was irrelevant and speculative.  Neither objection had merit.[5]

"No evidence is admissible except relevant evidence." (Evid. Code, § 350; see *People v. Melendez* (2016) 2 Cal.5th 1, 23.) "Evidence is relevant if it 'ha[s] any tendency in reason to prove or disprove any disputed fact.' [Citations.]  The trial court has broad latitude in determining relevance." (*People v. Howard* (2010) 51 Cal.4th 15, 31; accord, *People v. Benavides* (2005) 35 Cal.4th 69, 90 ["[t]he test of relevance is whether the evidence 'tends "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive'"]; see Evid. Code, § 210 ["'[r]elevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action"].)

Jensen's perception of the animosity that existed between Villa and Simms, as well as her concern about the tension between Villa and Alvarez, both victims of Villa's aggressive actions the following day, unquestionably tended to prove Villa's motive or intent in shooting Simms and threatening Alvarez with his gun.  Alvarez's understanding the situation was fraught did as well.  It was well within the trial court's broad discretion to

---

[5]     "We review claims regarding a trial court's ruling on the admissibility of evidence for abuse of discretion.  [Citations.] Specifically, we will not disturb the trial court's ruling 'except on a showing that the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266; accord, *People v. Jones* (2013) 57 Cal.4th 899, 947; *People v. Cruz* (2020) 46 Cal.App.5th 715, 729.)

11

determine the evidence was relevant.[6]  Nor was it speculative.
Both witnesses were asked to explain their own beliefs that the
situation could escalate into violence, not to guess what was in
Villa's mind.

On appeal Villa contends the testimony should have been
excluded under Evidence Code section 352 because any probative
value was outweighed by undue prejudice and suggests it was
also inadmissible as improper character evidence (see Evid. Code,
§ 1101, subd. (a)).  Because Villa failed to object to the testimony
on those grounds, his argument is not cognizable on appeal.
(*People v. Valdez* (2012) 55 Cal.4th 82, 130 ["Evidence
Code section 353, subdivision (a), provides that a court may not
reverse a judgment based on error in admitting evidence unless
'an objection to or a motion to exclude or to strike the evidence
. . . was timely made and so stated as to make clear the specific
ground of the objection or motion.'  'In accordance with this
statute, we have consistently held that the "defendant's failure to
make a timely and specific objection" on the ground asserted on
appeal makes that ground not cognizable'"]; cf. *People v. Doolin*
(2009) 45 Cal.4th 390, 437 [trial objection that evidence "was
irrelevant and unduly prejudicial under Evidence Code
section 352" was insufficient to preserve for appeal claim under
Evidence Code section 1101]; see also *People v. Demetrulias*
(2006) 39 Cal.4th 1, 22 ["To satisfy Evidence Code section 353,
subdivision (a), the objection or motion to strike must be both

---

[6]      That the trial court suggested a different theory of
relevance—the testimony explained Jensen's and Alvarez's
actions—is of no moment.  With evidentiary rulings, as with
other matters, we review the ruling itself, not the court's
reasoning.  (*People v. Mason* (1991) 52 Cal.3d 909, 944.)

timely *and* specific as to its ground.  An objection to evidence must generally be preserved by specific objection at the time the evidence is introduced; the opponent cannot make a 'placeholder' objection stating general or incorrect grounds (e.g.,'relevance') and revise the objection later in a motion to strike stating specific or different grounds"].)[7]

>   2. *The Court's Admonition To Disregard Portions of the Transcript of Estevez's Police Interview Cured Any Possible Error*
>
>       a. *Proceedings regarding Estevez's police interview*

In addition to Estevez's testimony the jury heard an audio recording of his interview with the police.  The jury was also provided a transcript of the interview, which included handwritten additions in several places where the transcript noted "inaudible."  Before the audio recording was played, the

---

[7]     Villa's additional argument that admission of this testimony violated his constitutional rights to due process and a fair trial lacks merit.  The objections he made were properly overruled.  (See *People v. Johnson* (2019) 8 Cal.5th 475, 517 [because trial court did not err in admitting evidence over defendant's objection, defendant's rights to due process and a fair trial were not violated]; *People v. Hartsch* (2010) 49 Cal.4th 472, 493, fn. 19 ["[r]ejection of a claim on its merits necessarily disposes of the additional constitutional 'gloss'"]; see generally *People v. Partida* (2005) 37 Cal.4th 428, 437-438 [a constitutional argument is forfeited to the extent the defendant argues on appeal that the constitutional provisions required the trial court to exclude the evidence for a reason not included in the actual trial objection; however, a defendant may argue an additional legal consequence of the asserted error in overruling an objection actually made is a violation of due process].)

court discussed it and the transcript with counsel outside the jury's presence.

Defense counsel stated he was concerned with Estevez's speculation, "why he believed somebody did something, why he believed—things that I believed your Honor would never allow him to say in court." Counsel pointed to several specific places in the transcript. On page 25 the transcript reads, "I don't know what the situation is. If this guy is just psycho or if he's a (Inaudible)." The word "fatal" is handwritten over "(Inaudible)." Counsel argued Estevez's opinion Villa was psycho or fatal was inadmissible.[8] Similarly, on page 30 of the transcript, counsel argued Estevez was speculating when he said, based on Villa's repeated presence in the neighborhood, that he seemed to be a "stalker," someone that "would be out there and (Inaudible) sometimes you feel somebody looking at you, I'd look, and he would be right there."

After initially suggesting the handwritten comments could be redacted, the court concluded it would admonish the jury to disregard the handwritten words as meaningless and to rely on the audio version of the interview as the evidence in the case. Defense counsel said he "would prefer to delete it."

The court then advised the jury the transcript is "basically the person who is making the transcription, it's what their

---

[8] Also on page 25 of the transcript, after Estevez said he saw Villa point the gun at Alvarez, the transcript reads, "I don't know if he did (Inaudible)." Handwritten over "(Inaudible)" is "shoot because he no more bullets." Although Villa discusses this handwritten notation on appeal, he did not call it to the attention of the court as one of his concerns during the discussion outside the presence of the jury.

version is and what they hear as they're transcribing.  It will not control what you hear.  You will listen to the tape and make your own–or CD and make your own–judgment as to what you are hearing.  This is merely a guide to help you go along, but you are not bound by this in any way, shape, or form.  That's number one, generally.  Number two, in this particular transcript, the way the copies were made from whatever original where the interpreter or the translator when they can't understand a word, they will put it in parens 'inaudible.'  Someone has listened to this.  They think they know what the inaudible was, and you will see in printing what that person–you are to completely disregard that.  That has nothing to do–you won't even look at that.  Just pay it no attention."  The court then pointed out the two specific portions of the transcript defense counsel had identified and instructed the jury as to each one to "completely strike that.  You will hear it in the audio.  You are not to consider it in any way.  It is just absolutely inadmissible.  Just give it no thought."

> b. *The jury is presumed to have followed the court's admonition to disregard any handwritten or speculative aspects of the interview transcript*

On appeal Villa does not contend the audio recording of Estevez's police interview was inadmissible, arguing only it was error to provide the jury with an unredacted transcript of the interview that also included handwritten notations where the transcript itself identified something as inaudible.  However, the trial court instructed the jury the transcript was not evidence, only the audio recording was, and additionally admonished the jurors to disregard as speculation any handwritten notations on the transcript, as well as Estevez's reference to Villa as a stalker.  We presume the jury followed the trial court's instructions.

15

(*People v. Frederickson* (2020) 8 Cal.5th 963, 1026; *People v. Erskine* (2019) 7 Cal.5th 279, 301; see *People v. Yeoman* (2003) 31 Cal.4th 93, 139 ["the presumption that jurors understand and follow instructions [is] '[t]he crucial assumption underlying our constitutional system of trial by jury'"].)

Villa attempts to avoid this fundamental principle by reliance on *People v. Aranda* (1965) 63 Cal.2d 518, in which the Supreme Court held a limiting instruction is not sufficient when the prosecution proposes to introduce into evidence an extrajudicial statement of one defendant that directly implicates a jointly tried defendant. *Aranda* and its federal analog, *Bruton v. United States* (1968) 391 U.S. 123 [88 S.Ct. 1620, 20 L.Ed.2d 476], present a very special situation: "*Aranda* and *Bruton* stand for the proposition that a 'nontestifying codefendant's extrajudicial self-incriminating statement that inculpates the other defendant is generally unreliable and hence inadmissible as violative of that defendant's right of confrontation and cross-examination, even if a limiting instruction is given.'" (*People v. Jennings* (2010) 50 Cal.4th 616, 652.) Both the California and United States Supreme Courts have held these cases recognize only "a narrow exception to the general rule that juries are presumed to follow limiting instructions." (*People v. Homick* (2012) 55 Cal.4th 816, 874, citing *Richardson v. Marsh* (1987) 481 U.S. 200, 206-207 [107 S.Ct. 1702, 95 L.Ed.2d 176]; accord, *People v. Ervine* (2009) 47 Cal.4th 745, 776.) Indeed, this narrow exception does not even apply in the case of a confession by one jointly tried defendant that only implicates a codefendant through reference to other evidence. (*Richardson*, at p. 208 ["[w]here the necessity of such linkage is involved, it is a less valid generalization that the jury will not likely obey the

16

instruction to disregard the evidence"]; see generally *Ervine,* at p. 776 [refusing to extend *Aranda* and *Bruton* outside the specific context in which they were decided; holding, "[w]e presume the jury faithfully followed the court's limiting instruction"].)  Villa offers no rationale, let alone a persuasive one, for refusing to apply in this case the general presumption regarding the effectiveness of the trial court's instructions and admonition.

3. *The Trial Court Did Not Abuse Its Discretion in Denying the Motion To Strike the Section 12022.53 Firearm Enhancement*

Because the jury found him guilty of voluntary manslaughter, not murder, Villa argues the trial court's decision not to strike the section 12022.53, subdivision (d), firearm enhancement as applied to his conviction for shooting an occupied motor vehicle, which added 25 years to life to his upper term sentence of seven years, was an abuse of discretion.  Villa points out the maximum penalty for voluntary manslaughter–an offense not subject to section 12022.53–when committed with a firearm is 21 years (the upper term of 11 years for voluntary manslaughter plus 10 years, the upper term for a firearm enhancement under section 12022.5, subdivision (a)) and contends imposition of a 25-year-to-life enhancement for shooting at an occupied vehicle effectively disregarded the jury's verdict and is disproportionate to the offense and arbitrary.

We review a trial court's decision not to strike a sentencing enhancement under section 1385 for abuse of discretion.  (*People v. Carmony* (2004) 33 Cal.4th 367, 374.)  The party challenging the sentence has the burden of showing the court's decision was ""irrational or arbitrary.""  (*Id.* at p. 376.)  ""In the absence of such a showing, the trial court is presumed to have acted to

17

achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.""" (*Id.* at pp. 376-377; see *People v. Sandoval* (2007) 41 Cal.4th 825, 847.)

The decision to include shooting at an occupied vehicle but not voluntary manslaughter as an offense qualifying for imposition of the section 12022.53, subdivision (d), firearm enhancement was made by the Legislature.[9] The disparity between the maximum sentence for the two offenses is not, without more, a basis to find the sentencing decision here arbitrary. (See *People v. Wilkinson* (2004) 33 Cal.4th 821, 840 ["[t]he Legislature is responsible for determining which class of crimes deserves certain punishments and which crimes should be distinguished from others"]; *In re Lynch* (1972) 8 Cal.3d 410, 414 ["in our tripartite system of government it is the function of the legislative branch to define crimes and prescribe punishments"].) Moreover, the record reflects the trial court was fully mindful of

---

[9] The enhancements in section 12022.53, subdivisions (b), (c) and (d), generally apply when the defendant has personally used a firearm in committing one of the qualifying felony offenses listed in subdivision (a). Murder is included (§ 12022.53, subd. (a)(1)); voluntary manslaughter is not. Although shooting at an occupied motor vehicle and other offenses prohibited by section 246 are also omitted from subdivision (a), section 1202253, subdivision (d), provides, "Notwithstanding any other provision of law, any person who, in the commission of a felony specified in subdivision (a), Section 246, or subdivision (c) or (d) of Section 26100, personally and intentionally discharges a firearm and proximately causes great bodily injury, as defined in Section 12022.7, or death, to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life."

Villa's argument that the jury, through its verdict, had impliedly found his culpability mitigated by provocation or heat of passion, but nonetheless concluded Villa had committed an extremely dangerous crime, firing multiple times at the victim, killing him, and had thereafter aggressively threatened a second victim.  In addition, as the prosecutor noted at sentencing, Villa, an active gang member, was a recidivist whose offenses were increasing in seriousness.  (See Cal. Rules of Court, rule 4.421(b) [circumstances in aggravation for felony sentencing].)  On this record the sentence was neither irrational nor disproportionate to the nature of the offense and was well within the trial court's broad discretion.

> 4. *Villa's Sentence Did Not Constitute Cruel and/or Unusual Punishment*

The Eighth Amendment's prohibition of cruel and unusual punishment, applicable to the states through the 14th Amendment, contains a "'narrow proportionality principle' that 'applies to noncapital cases.'"  (*Ewing v. California* (2003) 538 U.S. 11, 20 [123 S.Ct. 1179, 155 L.Ed.2d 108, 117] (*Ewing*) (plur. opn. of O'Connor, J.).)  Although strict proportionality between crime and sentence is not required, "'extreme sentences that are "grossly disproportionate" to the crime'" are constitutionally prohibited.  (*Id.* at p. 23; accord, *Graham v. Florida* (2010) 560 U.S. 48, 59 [130 S.Ct. 2011, 176 L.Ed.2d 825].)

To determine whether a particular sentence is so grossly disproportionate that it violates the federal Constitution, the court considers all the circumstances of the case, including the gravity of the offense and the severity of the penalty as well as whether more serious crimes are subject to the same penalty in other jurisdictions.  (*Graham v. Florida, supra*, 560 U.S. at p. 58;

*Solem v. Helm* (1983) 463 U.S. 277 [103 S.Ct. 3001, 77 L.Ed.2d 637].)  No single criterion is dispositive.  (*Solem*, at p. 291, fn. 17.)  "'[O]utside the context of capital punishment, *successful* challenges to the proportionality of particular sentences [will be] exceedingly rare.'"  (*Id.* at pp. 289-290, quoting *Rummel v. Estelle* (1980) 445 U.S. 263, 271 [100 S.Ct. 1133, 63 L.Ed.2d 382].)  Still, although deference is given to the Legislature's prescribed sentence for a particular crime (*Solem*, at p. 290), no penalty is per se constitutional.  (*Ibid.*)

The California Constitution's prohibition of "cruel or unusual punishment" (Cal. Const., art. I, § 17) similarly forbids punishment so disproportionate to the crime for which it was imposed that it "shocks the conscience and offends fundamental notions of human dignity."  (*In re Lynch*, *supra*, 8 Cal.3d at p. 424; accord, *People v. Dillon* (1983) 34 Cal.3d 441, 478; *People v. Gomez* (2018) 30 Cal.App.5th 493, 500.)  The *Lynch* Court identified three factors for the reviewing court to consider in assessing this constitutional claim:  (1) the nature of the offense and the offender; (2) how the punishment compares with punishments for more serious crimes in the jurisdiction; and (3) how the punishment compares with the punishment for the same offense in other jurisdictions.  (*Lynch,* at pp. 425-427.)

A claim that a particular sentence amounts to cruel and/or unusual punishment in violation of either the federal or California Constitution is a question of law subject to de novo review, while any underlying disputed facts are reviewed in the light most favorable to the judgment.  (*People v. Gomez, supra,* 30 Cal.App.5th at p. 499; *People v. Martinez* (1999) 76 Cal.App.4th 489, 496.)  "Successful challenges" to a sentence as cruel and/or unusual under either the federal Constitution or

20

California Constitution are "exceedingly rare." (*Ewing, supra,* 538 U.S. at pp. 20-21; accord, *People v. Perez* (2013) 214 Cal.App.4th 49, 60.)

Villa's contention his sentence is so disproportionate to his culpability as to constitute cruel and/or unusual punishment essentially repeats his argument that the trial court abused its discretion in refusing to strike the 25-year-to-life section 12022.53, subdivision (d), firearm enhancement–that is, by finding Villa guilty of voluntary manslaughter, the jury confirmed he was not a murderer and the shooting was mitigated by Simms's prior threats of violence and aggressiveness toward him.[10] Accordingly, Villa asserts, he should not be punished by a sentence longer than the maximum prescribed for that offense.

Whatever the reason for the jury's verdict that Villa was guilty of voluntary manslaughter, not murder (cf. *People v. Santamaria* (1994) 8 Cal.4th 903, 915 [favorable finding by jury may be product of mistake, leniency, compromise, confusion or

[10] Villa did not argue in his sentencing memorandum or at the sentencing hearing that failure to strike the section 12022.53, subdivision (d), firearm-use enhancement would result in cruel and/or unusual punishment. That omission has been held to forfeit the issue on appeal. (See, e.g., *People v. Baker* (2018) 20 Cal.App.5th 711, 720; *People v. Norman* (2003) 109 Cal.App.4th 221, 229.) Villa, however, did assert the sentence being considered was disproportionate to his culpability–the fact-specific foundation for a cruel and/or unusual punishment claim; and the People address Villa's argument on the merits, as do we. (Cf. *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1368 [although court of appeal held defendant had forfeited his right to challenge his sentence as cruel and unusual punishment by failing to object on that ground in the trial court, Supreme Court exercised its discretion to consider the issue].)

21

ennui]),[11] Villa's argument significantly understates both his individual culpability in firing multiple shots at a romantic rival and the danger to society created by violations of section 246, which in this case resulted in the death of his victim.

The elements of a section 246 offense are "(1) acting willfully and maliciously, and (2) shooting at an inhabited house [or occupied vehicle]." (*People v. Ramirez* (2009) 45 Cal.4th 980, 985; accord, *People v. Hernandez* (2010) 181 Cal.App.4th 1494, 1501.) As defined by CALCRIM No. 965, used at Villa's trial, for purposes of the charge of shooting at an occupied motor vehicle, "[s]omeone acts maliciously when he intentionally does a wrongful act or when he acts with the unlawful intent to disturb, defraud, annoy, or injure someone else." The jury's necessary finding that Villa acted maliciously when he fired at Simms's car makes the life sentence he received fully commensurate with his

---

[11] While returning a not guilty verdict on first degree murder and guilty verdicts on both aggravated assault and shooting at an occupied vehicle with a true finding that Villa had personally discharged a firearm causing Simms's death, the foreperson advised the court the jury was divided seven-to-five whether to find Villa guilty of second degree murder or voluntary manslaughter. The jury thereafter asked the court, "Can someone be considered guilty of murder two if they acted under the 'heat of passion' and the four items that fall under implied malice aforethought also apply for the situation, or would this reduce voluntary manslaughter only because the 'heat of passion' applies?" The court responded, "I think I can answer your question. I am not going to answer it yes or no. What I am going to do is re-read two instructions [CALCRIM Nos. 520 and 570], and I am going to give you an additional instruction [CALJIC No. 850], okay?" The jury returned its verdict that Villa was guilty of voluntary manslaughter the following day.

"personal responsibility and moral guilt." (See *Enmund v. Florida* (1982) 458 U.S. 782, 801 [102 S.Ct. 3368, 73 L.Ed.2d 1140].) There is nothing about Villa's crime that distinguishes it from the many other cases upholding imposition of an indeterminate life sentence for offenses other than murder. (See, e.g., *People v. Riva* (2003) 112 Cal.App.4th 981, 986, disapproved on another ground in *People v. Anderson* (2020) 9 Cal.5th 946, 956 [sentence of 30 years to life held not cruel and unusual punishment for shooting at an occupied vehicle and causing great bodily injury]; see also *People v. Garcia* (2017) 7 Cal.App.5th 941, 949-950 [sentence of seven years for attempted murder plus 25 years to life for the firearm enhancement held not cruel and unusual punishment under federal and state Constitutions]; *People v. Villegas* (2001) 92 Cal.App.4th 1217, 1221-1222 [sentence of 40 years to life held not cruel and unusual punishment for attempted murder, mayhem, and assault with a firearm]; *People v. Morales* (1992) 5 Cal.App.4th 917, 930 [life sentence for one count of attempted murder held not cruel and unusual].)[12]

---

[12] Villa makes no attempt to demonstrate his punishment for shooting at an occupied vehicle and killing the occupant is disproportionate to the punishment for similar offenses in other jurisdictions. Other than the conclusory assertion that voluntary manslaughter is a more serious offense than shooting at an occupied motor vehicle resulting in a death, he makes no effort to compare his sentence to those for other crimes in California. Accordingly, he fails to demonstrate disproportionality on those grounds.

### 5. *Villa's Sentence Must Be Modified To Strike the One-year Prior Prison Term Enhancement*

In October 2019 the Legislature enacted Senate Bill No. 136 (Stats. 2019, ch. 590, § 1) amending section 667.5, subdivision (b), effective January 1, 2020. The new law limited the applicability of that provision's one-year sentence enhancement for prior prison terms to defendants who had previously served a prison term for sexually violent offenses as defined in Welfare and Institutions Code section 6600, subdivision (b). This ameliorative amendment applies to nonfinal judgments on appeal. (*People v. Petri* (2020) 45 Cal.App.5th 82, 94 ["amendment to section 667.5, subdivision (b)," effective January 1, 2020, "applies retroactively to all defendants whose judgments are not yet final as of that date"]; see *People v. Matthews* (2020) 47 Cal.App.5th 857, 865; *People v. Winn* (2020) 44 Cal.App.5th 859, 872-873; see generally *In re Estrada* (1965) 63 Cal.2d 740, 748 [for a nonfinal conviction, "where the amendatory statute mitigates punishment and there is no saving clause, the rule is that the amendment will operate retroactively so that the lighter punishment is imposed"].)

Because Villa's prior conviction was not for a sexually violent offense, the one-year prior prison term enhancement included in his sentence must be stricken. In supplemental letter briefing the People acknowledge the enhancement must be stricken and request the matter be remanded for resentencing to permit the trial court to reconsider all its sentencing options without the section 667.5, subdivision (b), enhancement.[13] We

---

[13] In his supplemental letter brief Villa argued he was entitled to the benefit of Senate Bill No. 136 but did not address the question of a remand for resentencing.

agree a remand for resentencing is appropriate in the circumstances of this case.  (See *People v. Buycks* (2018) 5 Cal.5th 857, 893 ["when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances'"]; accord, *People v. Navarro* (2007) 40 Cal.4th 668, 681.)

## DISPOSITION

Villa's convictions are affirmed.  The sentence is vacated, and the matter remanded with instructions to strike the one-year prior prison term enhancement imposed under section 667.5, subdivision (b), and to conduct further sentencing proceedings not inconsistent with this opinion.


PERLUSS, P. J.


We concur:



SEGAL, J.



FEUER, J.

25