Filed 2/22/21  P. v. Gibson CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C089393 |
| Plaintiff and Respondent, | (Super. Ct. No. 17FE002558) |
| v. | |
| BRITTANY RENE GIBSON et al., | |
| Defendants and Appellants. | |

A jury found defendants Brittany Rene Gibson and Devonta J. MacDonald guilty of attempted murder, conspiracy to commit murder, and assault with a firearm.  The jury further found that MacDonald unlawfully possessed a firearm, personally used a firearm, personally used and intentionally discharged a firearm, and personally used and intentionally discharged a firearm causing great bodily injury.  The trial court found true an allegation that MacDonald had a prior serious felony conviction.  The trial court sentenced Gibson to 25 years to life and MacDonald to 43 years to life in state prison.

1

MacDonald and Gibson appeal, raising separate claims of instructional and sentencing error.  MacDonald contends: (1) the trial court violated his constitutional rights by instructing the jury pursuant to CALCRIM No. 315 that a witness's level of certainty is a factor to be considered in evaluating the accuracy of identification testimony; (2) the trial court should have stayed his sentence for unlawfully possessing a firearm pursuant to Penal Code section 654; (3) remand is necessary to allow the trial court to exercise its discretion to strike the firearm enhancement for personal use and discharge of a firearm causing great bodily injury and impose a lesser firearm enhancement in its place; and (4) he should receive two additional days of presentence custody credit.[1]  The People concede the last contention, and we accept the concession. We reject MacDonald's other contentions.

Gibson contends: (1) the trial court should have instructed the jury on the lesser related offense of being an accessory after the fact; (2) the trial court should have instructed the jury on the lesser included offense of conspiracy to commit assault with a deadly weapon; (3) the trial court imposed an unauthorized sentence of "seven years to life" for her attempted murder conviction, rather than a sentence of "life with the possibility of parole after serving a minimum of seven years"; and (4) the trial court erred in imposing various fines and fees without determining her ability to pay.  We reject all of Gibson's contentions.

We will direct the trial court to award MacDonald two days of presentence custody credits.  In all other respects, we affirm.

---

[1] Undesignated statutory references are to the Penal Code.

2

# I. BACKGROUND

## A. *The Shooting*

The victim, Terrell, moved from Alabama to Sacramento in September 2016. He met Gibson and began a dating relationship with her a short time later. Terrell understood that MacDonald was Gibson's ex-boyfriend. MacDonald received mail at Gibson's house and called from time to time. But Terrell never laid eyes on MacDonald and never even saw a photograph of him.

That changed one day in late October or early November 2016, as Gibson and Terrell were preparing to leave Gibson's house. The couple was backing out of the driveway in Gibson's car when MacDonald appeared, blocked the driveway and approached the car, demanding to know, " 'What you got going on? Just what you doing? Who is this?' " Gibson drove away, but MacDonald followed in his car.

Gibson spoke to MacDonald by phone as she drove. She warned MacDonald to stop following her or she would shoot. She then produced a .40 caliber Smith & Wesson handgun from her purse. She cocked the gun as she drove. MacDonald gave up the chase and Gibson and Terrell continued on their way. During the trial, Terrell testified that Gibson owned two guns and always carried the loaded .40 caliber Smith & Wesson in her purse.

Terrell went to Alabama for several weeks in December 2016. He returned to Sacramento in January 2017. He took up residence with Gibson, but things were not the same. Gibson was still receiving MacDonald's mail and speaking with him regularly by phone, just as she had done before Terrell went to Alabama. Only now, Terrell began to suspect that Gibson might be cheating on him.

Terrell was hoping to enjoy a romantic evening with Gibson on February 6, 2017. But Gibson came home later than expected and then announced that she was going out with a friend. Disappointed, Terrell went for a short walk. When he returned, Gibson's friend was there. An argument ensued. During the course of the argument, Terrell

climbed into the passenger's seat of Gibson's parked car, as if to accompany her. Gibson tried to pull Terrell out of the car. Terrell resisted. Gibson scratched Terrell's face in the tussle.

Gibson told Terrell he needed to leave the house. Terrell agreed and began collecting his belongings. As Terrell was packing to leave, Gibson asked that he return her car keys. Terrell responded that he did not have them. However, Terrell forgot that he had taken the keys and put them in the pocket of some work clothes. It was only later, after the events described below, that Terrell discovered the keys in his pocket.

Terrell left Gibson's house and went to the home of a nearby relative. Over the course of the evening, Gibson called Terrell several times and sent several text messages, all demanding the return of her keys. Gibson also called 911 and reported that Terrell had taken her keys. Sacramento Police Officer Jeffrey Daigle called Terrell to ask about the keys. Terrell insisted, again, that he did not have them.

Gibson appeared at the home of Terrell's relative sometime later. Gibson honked her horn, banged on the security gate, and threw a garbage can, all the while yelling about the keys. Gibson later contacted Terrell's relative by text, stating that she knew the route Terrell took to work, and was going to " 'get him and mess him up.' "

Terrell went to work that night, completed his shift, and returned to his relative's house. During this time, he exchanged numerous text messages with Gibson regarding the missing car keys and other personal belongings. It was clear to Terrell by now that the relationship with Gibson was over, and his belongings were probably gone for good.

Terrell went to the store for cigarettes on the evening of February 7, 2017. He then walked back to his relative's house. He chose a route that would take him past Gibson's house, thinking he might knock on her door and ask for his things. As he walked along a frontage street near Gibson's house, he saw a car approaching. He recognized the car as Gibson's. The car pulled up next to Terrell, and Terrell approached the driver's side. The driver's side window rolled down, and Terrell saw a man's face.

4

Terrell did not immediately recognize the face and turned to walk away. As he did so, however, he saw Gibson lean forward from the passenger's seat, so that her head was visible on the far side of the male driver. Terrell saw the man turn towards Gibson. He then saw Gibson nodding her head. The man reached for something with his right hand. The man then turned to face Terrell. Terrell, upon seeing the man's face again, now recognized him as MacDonald. Terrell then saw Gibson's .40 caliber Smith & Wesson in the man's hand.

MacDonald pointed the gun at Terrell and started firing. Terrell was shot in the stomach, thigh, and forearm from a distance of approximately 15 feet. The car sped away. Terrell managed to get up and began limping down the street. Within seconds, however, Terrell saw the car reverse and return to his location. Terrell was then shot four more times; once in the buttocks, twice in the thigh, and once in the hand. Terrell was not able to see who shot him the second time, as his back was turned and he was trying to get away. The car then drove away a second time, leaving Terrell bleeding in the street.

Terrell managed to stand again and started staggering towards his relative's house. He soon collapsed, however. Neighbors called 911 and came to Terrell's aid. Terrell told them, "Brittany Gibson and her boyfriend just shot me." Terrell called his relative and told her the same thing.

Officer Daigle arrived on the scene and found Terrell lying face down on the ground. Terrell was lucid and told Daigle that Gibson and her ex-boyfriend pulled up alongside him, and the ex-boyfriend starting shooting. Daigle ran Gibson's name and learned that she was the registered owner of two guns, including the .40 caliber Smith & Wesson. Daigle also learned that MacDonald was on probation and used Gibson's address as his residence.

After the shooting, MacDonald and Gibson parked the car and made their way to the apartment of MacDonald's sister. They returned to their parked car several hours later. Police, who had been surveilling the car, followed MacDonald and Gibson to a gas

5

station, where they were placed under arrest. A video camera captured them kissing in the backseat of the patrol car.

Terrell was transported to the hospital, where he was treated for multiple gunshot wounds. Police visited Terrell in the hospital early the next morning. Terrell readily identified MacDonald from a six-pack photo lineup.[2] Terrell remained in the hospital for some weeks, undergoing a blood transfusion and surgery to repair damage to his intestines.

B.      *The Charges and Jury Trial*

MacDonald and Gibson were charged by amended information with attempted murder (§§ 664, 187, subd. (a)—count one), conspiracy to commit murder (§ 182, subd. (a)(1)—count two), and assault with a firearm (§ 245, subd. (a)(2)—count three). MacDonald was also charged with possession of a firearm by a felon (§ 29800, subd. (a)(1)—count four). The information further alleged that the attempted murder was committed willfully, deliberately, and with premeditation (§ 664, subd. (a)), and that Gibson, a principal in the offense, was armed with a firearm (§ 12022, subd. (a)(1)) and MacDonald personally used a firearm, personally and intentionally discharged a firearm, and personally and intentionally discharged a firearm causing great bodily injury or death. (§ 12022.53, subds. (b)-(d).) The information further alleged that MacDonald had a prior serious felony conviction. (§§ 667, subds. (b)-(i), 1170.12.) MacDonald and Gibson pled not guilty and denied the allegations.

The matter was tried to a jury in June 2018. The prosecution's witnesses testified substantially as described *ante*. Gibson testified in her own defense. Gibson explained that she owned two guns, which she kept for self-defense. She recalled that she began

---

[2] Officer Jonathan Monroe of the Sacramento Police Department testified that Terrell identified MacDonald from the six-pack photo lineup within two seconds.

dating MacDonald in 2015. According to Gibson, MacDonald was abusive and occasionally violent. Gibson testified that she was afraid of him.

Gibson recalled that MacDonald was in custody when she met Terrell in September 2016. Gibson acknowledged that she remained in regular contact with MacDonald, even after she started dating Terrell. Gibson testified that MacDonald was released from custody in October 2016, and he regularly stopped by her house to collect his mail. She explained that MacDonald and Terrell encountered one another in front of her house on several occasions, most of them contentious. She remembered one incident in which MacDonald blocked her driveway, and another in which MacDonald followed Gibson and Terrell as she spoke with him by phone. However, she denied threatening to shoot MacDonald, or driving with a cocked gun.

Gibson acknowledged arguing with Terrell on February 6, 2016. She confirmed that Terrell agreed to leave and eventually decamped to his relative's house. She also confirmed that there was an extended back and forth regarding the whereabouts of her car keys. She explained that she retrieved a spare set of keys from her grandparents and then drove to the home of Terrell's relative, where she merely honked her horn. She denied getting out of the car or throwing a garbage can.

Gibson, a nursing student, explained that she had clinical rotations in Grass Valley on February 7, 2016. She was planning to spend the night in Grass Valley and asked MacDonald to accompany her. MacDonald agreed and went to Gibson's house. Gibson was out, but told MacDonald to let himself into the house with a key that she kept outside. Gibson returned to the house shortly thereafter. MacDonald and Gibson were sexually intimate and then left for Grass Valley at 3:00 a.m. Gibson attended her clinical rotations in Grass Valley. When she was done, she and MacDonald decided to return to Sacramento rather than spend the night in Grass Valley.

Gibson and MacDonald arrived in Sacramento on the afternoon of February 7, 2016. They ran some errands. Gibson testified that she did not have her gun and did not

7

know that MacDonald had a gun.  According to Gibson, MacDonald was driving back to her house, and she was reclining in the passenger seat with her eyes closed.  She sensed the car slowing down and assumed they were pulling up to her house.  In Gibson's version of events, she heard the driver's side window descend and sat up in time to see MacDonald firing at someone.  She recognized Terrell as the target within the first few shots.

Gibson testified that she tried to grab MacDonald's arm, but he threw her off and continued firing.  She said she then tried to open the passenger's side door to leave but was unable to do so because MacDonald was driving too quickly.  She said she then attempted to call 911 but was unable to complete the call because MacDonald grabbed her phone.

After the shooting, MacDonald drove to an apartment complex and parked the car. According to Gibson, MacDonald threatened to harm her and instructed her to keep her mouth shut.  Gibson explained that MacDonald still had her gun and phone, and she was afraid of what he might do.  MacDonald and Gibson then went across the street to the apartment of one of MacDonald's girlfriends or ex-girlfriends.  MacDonald took a shower.  He then used Gibson's phone to arrange for a ride to his sister's apartment. Gibson did not try to leave the apartment or summon help while MacDonald was showering.

Gibson and MacDonald then went to MacDonald's sister's apartment.  They spent several hours there, during which time, Gibson briefly fell asleep.  MacDonald woke Gibson at approximately 10:00 p.m. so she could watch a television news report about the shooting.  As before, Gibson did not try to leave MacDonald or call police.  MacDonald's sister then drove Gibson and MacDonald to Gibson's house.  Gibson went into the house by herself to retrieve some things for nursing school.  Once again, she made no attempt to call police or summon help.

8

Gibson, MacDonald, and MacDonald's sister then made their way to the parking lot where Gibson's car was parked. Gibson and MacDonald were arrested a short time later. According to Gibson, MacDonald instructed her to say nothing to police as they sat in the backseat of the patrol car.

Gibson was questioned by police a short time later. She initially told police she had no idea why she had even been pulled over. She then told police she kept her guns in a cabinet in the garage. When a probation search of her house failed to uncover the guns, Gibson told police they had been stolen. She did not tell police that MacDonald had taken her guns or used her .40 caliber Smith & Wesson to shoot Terrell. On cross-examination, Gibson admitted lying to police.

Gibson continued to communicate with MacDonald after she was released from jail, while he remained in custody. Among other things, Gibson sent MacDonald emails professing her love, raising the possibility of marriage, and opining that she might not qualify for a nursing license with a felony conviction.

Gibson testified that MacDonald repeatedly threatened her—after the shooting, at the time of their arrest, and thereafter—warning her to "stay loyal" and intimating that he might hurt her if she failed to do so. Gibson also claimed that MacDonald suggested they get married so she would be unable to testify against him.

Psychologist Geoffrey Loftus, Ph.D., testified as an expert on eyewitness identification, memory, and perception. Dr. Loftus explained that several factors may affect the accuracy of a witness's memory. The duration of the event, stressfulness of the event, and quality of lighting can affect a person's ability to receive information and undermine the accuracy of an eyewitness identification. The presence of a weapon can also undermine the accuracy of an eyewitness identification, as people tend to focus on the weapon, rather than the person holding it.

Dr. Loftus emphasized that witnesses may unconsciously rely on "pre[-]event information" and "post[-]event information" to supplement their memories of actual

9

events and may honestly and confidently believe that they remember things that are not based on their actual experiences. As a result, Dr. Loftus explained, "a witness can provide a very confident account of anything, including the identity of somebody who they saw commit a crime and yet potentially be wrong." Based on a hypothetical with facts similar to the present case, Dr. Loftus opined that the eyewitness identification of a person shot multiple times from a car at a distance of 15 feet, in the dark, would not be "super reliable," even though the person might have a high degree of confidence in the identification.

## C.     *Verdict and Sentencing*

The jury found MacDonald and Gibson guilty as charged. The trial court sentenced Gibson to an indeterminate term of 25 years to life for the conspiracy to commit murder charged in count two (§ 182, subd. (a)(1)), stayed the sentence on the remaining counts, and imposed various fines and fees.

In a bifurcated proceeding, the trial court found true the allegation that MacDonald had a prior serious felony conviction. The trial court granted MacDonald's motion to strike the prior serious felony conviction pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*) in part, striking the conviction for purposes of sentencing under count two only. The trial court then sentenced MacDonald to an indeterminate term of 39 years to life for count one (seven years to life, doubled for the strike, plus 25 years for the enhancements), followed by a consecutive determinate term of four years for being a felon in possession of a firearm. The trial court imposed an indeterminate sentence of 25 years to life for count two, and a determinate sentence of two years for count three (assault with a firearm), but stayed the sentence on both counts pursuant to section 654. The trial court also imposed various fines and fees.

These appeals timely followed.

10

## II. DISCUSSION

### A. *MacDonald's Contentions*

MacDonald contends: (1) the trial court erred in giving CALCRIM No. 315, which directed the jury to consider the level of certainty with which an eyewitness makes an identification; (2) the trial court should have stayed his sentence for unlawfully possessing a firearm pursuant to section 654; (3) remand is necessary to allow the trial court to exercise its discretion to strike the firearm enhancements imposed under section 12022.53, subdivision (d) and instead impose a firearm enhancement under subdivision (b) or (c); and (4) he should receive two additional days of presentence custody credit. We consider MacDonald's contentions seriatim.

#### 1. *CALCRIM No. 315*

MacDonald argues the trial court violated his constitutional rights by instructing jurors with CALCRIM No. 315, the standard instruction on eyewitness identification. CALCRIM No. 315 instructs the jury to consider various questions in deciding whether an eyewitness "gave truthful and accurate testimony," including, "How certain was the witness when he or she made an identification?" MacDonald argues this portion of the instruction runs counter to scientific studies showing that witness certainty does not correlate with accuracy, and consequently deprived him of due process and a fair trial.

Our Supreme Court has repeatedly approved similar language in CALJIC No. 2.92, the virtually identical predecessor to CALCRIM No. 315. (See *People v. Sañchez* (2016) 63 Cal.4th 411, 461-462 (*Sañchez*); *People v. Johnson* (1992) 3 Cal.4th 1183, 1230-1232 (*Johnson*); see also *People v. Wright* (1988) 45 Cal.3d 1126, 1143-1144 (*Wright*).) In *Johnson*, the trial court instructed the jury with a modified version of CALJIC No. 2.92, which urged jurors to consider "[t]he extent to which the witness was either certain or uncertain of the identification." (*Johnson, supra,* at p. 1230, fn. 12.) There, as here, the defendant argued the trial court erred in permitting the jury to consider the certainty of a witness's identification because an expert had testified, without

11

contradiction, that "confidence in an identification does not positively correlate with its accuracy." (*Id.* at p. 1231.)  The Supreme Court disagreed, finding no error. (*Id.* at p. 1232; see also *Wright, supra,* at pp. 1138-1144 [approving CALJIC No. 2.92].)

In *Sañchez,* another case involving CALJIC No. 2.92, the jury was similarly instructed to consider a witness's certainty in making an identification. (*Sañchez, supra,* 63 Cal.4th at p. 461.)  On appeal, the defendant relied upon "scientific studies that conclude there is, at best, a weak correlation between witness certainty and accuracy," and argued the trial court "erred in instructing the jury it could consider the certainty factor." (*Ibid.*)  The Supreme Court concluded the defendant forfeited the claim by failing to request modification of the instruction. (*Ibid.*)  But the court considered the merits anyway, concluding there was no error in giving the instruction, and no prejudice in any event. (*Id.* at p. 462.)  The court observed that studies suggesting a weak correlation between witness certainty and accuracy were "nothing new," adding that *Wright* "specifically approved CALJIC No. 2.92, including its certainty factor," and *Johnson* "reiterated the propriety of including this factor." (*Ibid.*)  The court declined to reconsider the propriety of these previous holdings. (*Ibid.*)

Our Supreme Court is currently considering whether the certainty factor as articulated in CALCRIM No. 315 remains valid. (See *People v. Lemck* (June 21, 2018, G054241) [nonpub. opn.] review granted Oct. 10, 2018, S250108.)  MacDonald urges us to anticipate the Supreme Court's overruling of *Sañchez* by concluding that CALCRIM No. 315 improperly encourages jurors to consider witness certainty in evaluating identification testimony.  *Sañchez,* however, remains good law.  Unless and until the Supreme Court overrules or modifies *Sañchez,* we are bound by its holding that including the certainty factor was not improper. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

But even assuming the Supreme Court reverses course and determines the instruction was erroneous, any such error was harmless. (See *Sañchez, supra,* 63 Cal.4th

at p. 463; *Wright, supra,* 45 Cal.3d at p. 1144 [analyzing instructional error under the *Watson* harmless error standard].)[3]  The problem for MacDonald was that he was not a stranger to Terrell.  Although Terrell did not immediately recognize MacDonald, he soon placed him as Gibson's boyfriend or ex-boyfriend and identified him as such to bystanders, his relative, and police.  Moreover, Terrell's identification of MacDonald was corroborated by Gibson, who likewise identified MacDonald as the shooter, and further testified that they went to the homes of MacDonald's girlfriend or ex-girlfriend and sister after the shooting.  On the record before us, we perceive no reasonable probability that MacDonald would have obtained a more favorable result had CALCRIM No. 315 been modified to omit the certainty factor.  (See *Sañchez, supra,* 63 Cal.4th at p. 463; *Wright, supra,* 45 Cal.3d at p. 1144-1145.)  We therefore reject MacDonald's claim of instructional error.

2.      *Section 654*

MacDonald next argues the trial court erroneously imposed a consecutive sentence for being a felon in possession of a firearm (§ 29800, subd. (a)(1)), and the sentence should have been stayed under section 654.  We are not persuaded.

Section 654 bars double punishment for multiple offenses that constitute one indivisible transaction.  (*People v. Hicks* (1993) 6 Cal.4th 784, 788-789.)  However, a defendant may be separately punished for offenses that share common acts and are part of an indivisible course of conduct where the defendant entertained multiple criminal objectives.  (*People v. Cleveland* (2001) 87 Cal.App.4th 263, 267-268; *People v. Green* (1996) 50 Cal.App.4th 1076, 1084-1085 (*Green*).)  Whether a course of conduct is indivisible depends on the defendant's intent and objective rather than the temporal

---

[3] *People v. Watson* (1956) 46 Cal.2d 818, 836.

proximity of the offenses. (*Hicks, supra,* at p. 789; *People v. Jones* (2002) 103 Cal.App.4th 1139, 1143 (*Jones*).)

" 'Whether section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination.' " (*People v. Cruz* (2020) 46 Cal.App.5th 715, 737.) A trial court's findings under section 654 " 'will not be reversed on appeal if there is any substantial evidence to support them. [Citations.] We review the trial court's determination in the light most favorable to the respondent and presume the existence of every fact the trial court could reasonably deduce from the evidence.' " (*People v. Jacobo* (2019) 37 Cal.App.5th 32, 53-54.)

Section 29800, subdivision (a)(1) forbids a person convicted of a felony from possessing a firearm. The elements of this offense require conviction of a felony and ownership or knowing possession, custody, or control of a firearm. (*People v. Blakely* (2014) 225 Cal.App.4th 1042, 1052.) The offense is completed once the intent to possess is perfected by possession. (*Jones, supra,* 103 Cal.App.4th at p. 1146; § 29800, subd. (a)(1).)

Whether a violation of section 29800, subdivision (a)(1) constitutes a transaction divisible from the offense in which the defendant uses the firearm depends on the facts and circumstances of each individual case. (*People v. Bradford* (1976) 17 Cal.3d 8, 22.) On the one hand, " ' "where the evidence shows a possession distinctly antecedent and separate from the primary offense, punishment on both crimes has been approved. On the other hand, where the evidence shows a possession only in conjunction with the primary offense, then punishment for the illegal possession of the firearm has been held to be improper where it is the lesser offense." ' " (*Jones, supra,* 103 Cal.App.4th at p. 1143.) Multiple punishment is improper "where the evidence 'demonstrates at most that fortuitous circumstances put the firearm in the defendant's hand only at the instant of committing another offense.' " (*Id.* at p. 1144; see, e.g., *People v. Bradford, supra,* at p. 13 [multiple punishment barred where the defendant shot a Highway Patrol Officer

several times with a gun wrested from the officer during a stop moments before the shooting].)

MacDonald argues the evidence established that Gibson had the .40 caliber Smith & Wesson in her purse and only handed him the gun in the moments immediately before the shooting. He notes that the Smith & Wesson was registered to Gibson, and there was testimony from Terrell that she always kept the gun in her purse. He acknowledges that Gibson testified he had the gun, but notes the prosecutor urged jurors to reject Gibson's theory that he took it without her knowledge in closing argument. We perceive no error. Although Terrell testified that Gibson kept the .40 caliber Smith & Wesson in her purse, he also testified that she had allowed him to carry her guns from time to time, raising an inference that she sometimes ceded possession of the gun to others. Indeed, Gibson testified that MacDonald withdrew the gun from the front pocket of his hooded sweatshirt immediately before the shooting. The trial court could reasonably credit Gibson's testimony that MacDonald had possession of the gun prior to the shooting, which constitutes substantial evidence that the firearm possession was " ' "distinctly antecedent and separate" ' " from the attempted murder. (*Jones, supra,* 103 Cal.App.4th at p. 1143.)

Terrell's testimony further supports the trial court's finding. Terrell testified that MacDonald reached for the gun with his right hand. Terrell demonstrated the reach in the courtroom, with movements which the trial court described as follows: "The witness just reached down his hand with his elbow kind of cocked, then extended the forearm down so it's straight and then brought the forearm up with the elbow kind of staying in the same place." The trial court's description of Terrell's movement suggests a downward reach, consistent with a driver retrieving an object from somewhere on or about his person. Nothing in the record suggests that MacDonald reached over to the passenger's side to grab the gun from Gibson. If anything, the trial court's observation that Terrell's right elbow was "cocked" suggests to us that MacDonald could not have been reaching over to the passenger's side. We need not speculate over the mechanics of MacDonald's

15

reach, however, as the trial court, which observed Terrell's demonstration, was in the best position to determine whether MacDonald already possessed the gun or fortuitously obtained possession from Gibson in the moments preceding the attempted murder. On the record before us, we conclude that substantial evidence supports the trial court's implied finding that MacDonald's possession was " ' "antecedent and separate" ' " from the attempted murder (*Jones, supra,* 103 Cal.App.4th at p. 1143), and therefore, the court's exercise of discretion in imposing a consecutive sentence for being a felon in possession was not error.

### 3. *Sentencing Discretion*

MacDonald's sentence included an enhancement of 25 years to life for personal and intentional discharge of a firearm causing great bodily injury or death under section 12022.53, subdivision (d). MacDonald argues remand is required because the trial court failed to recognize its discretion to strike the greater firearm enhancement under section 12022.53, subdivision (d) and impose a lesser firearm enhancement under subdivision (b) or (c). We are not persuaded.

#### a. *Additional Background*

During the sentencing hearing, MacDonald's counsel alluded to Senate Bill No. 620 and asked the trial court to exercise its newly granted discretion to strike the firearm enhancement. The trial court declined to do so, stating: "I'm not going to exercise my discretion to strike the firearms and GBI enhancement because I think this case was made for that enhancement, and so he'll get an additional 25 years to life for the 12022.53(d)." Nevertheless, in an act of lenity, the trial court granted MacDonald's *Romero* motion, in part, striking his prior serious felony conviction for purposes of sentencing under count two (the conspiracy count) only.

#### b. *Analysis*

Section 12022.53 provides three different sentence enhancements for the personal use of a firearm in the commission of enumerated offenses: a 10-year enhancement for

16

the personal use of a firearm (§ 12022.53, subd. (b)); a 20-year enhancement for the personal and intentional discharge of a firearm (§ 12022.53, subd. (c)); and a 25-year-to-life enhancement for the personal and intentional discharge of a firearm causing great bodily injury or death (§ 12022.53, subd. (d)). Section 12022.53, subdivision (h), in effect at the time of MacDonald's May 2019 sentencing, authorizes the trial court to strike or dismiss an enhancement in the interest of justice pursuant to section 1385. MacDonald contends the trial court failed to recognize its discretion to strike the 25-year-to-life enhancement under subdivision (d) and impose a lesser enhancement of 10 years under subdivision (b) or 20 years under subdivision (c). The record does not support MacDonald's contention.

MacDonald's argument for remand rests on *People v. Morrison* (2019) 34 Cal.App.5th 217 (*Morrison*), in which the court held that section 12022.53, subdivision (h) allows a trial court, in the exercise of its discretion, to strike a greater firearm enhancement and impose an uncharged lesser enhancement in the interests of justice pursuant to section 1385. (*Morrison, supra,* at pp. 220-223.) MacDonald's reliance on *Morrison* is misplaced.[4] There, the defendant was charged with a single firearm enhancement under section 12022.53, subdivision (d), which the jury found true.

---

[4] Several courts of appeal have disagreed with *Morrison*'s reasoning, and the scope of the trial court's discretion to substitute a lesser uncharged firearm enhancement for a greater firearm enhancement is currently pending before the California Supreme Court. (See *People v. Tirado* (2019) 38 Cal.App.5th 637, 643 (*Tirado*), review granted Nov. 13, 2019, S257658 ["Nothing in the plain language of sections 1385 and 12022.53, subdivision (h) authorizes a trial court to substitute one enhancement for another"]; see also *People v. Garcia* (2020) 46 Cal.App.5th 786, 793-794, review granted June 10, 2020, S261772 [following *Tirado* and holding that § 12022.53, subd. (h) does not grant trial courts discretion to substitute lesser included firearm enhancements].) We need not address this split in authority, because the present case does not involve the imposition of uncharged lesser enhancements.

(*Morrison, supra,* at p. 221.) The court concluded that the trial court had discretion to impose a lesser, uncharged firearm enhancement under section 12022.53, subdivision (b) or (c) "as a middle ground to a lifetime enhancement under section 12022.53, subdivision (d), if such an outcome was found to be in the interests of justice under section 1385." (*Morrison, supra,* at p. 223.) The case was remanded because nothing in the record indicated that the trial court understood this option was available, and, at the time of sentencing, "no published case had held an uncharged lesser firearm enhancement could be imposed in lieu of an enhancement under section 12022.53, subdivision (d) in connection with striking the greater enhancement." (*Id.* at p. 224.) Significantly, the *Morrison* court explicitly limited its holding to "cases where those enhancements have not been charged in the alternative and found true." (*Id.* at p. 225.) This is not such a case.

Unlike the defendant in *Morrison*, MacDonald was charged with multiple firearm enhancements under section 12022.53, subdivisions (b), (c), and (d), each of which was found true. Had the trial court exercised its discretion to strike or dismiss the 25-year-to-life enhancement under subdivision (d), the court could have then considered whether to impose one of the lesser enhancements under subdivisions (b) or (c). (See § 12022.53, subd. (f) ["If more than one enhancement per person is found true under this section, the court shall impose upon that person the enhancement that provides the longest term of imprisonment].) This was clearly the state of the law at the time of sentencing, as the *Morrison* court acknowledged some six months later, when, in laying the groundwork for the novel issue raised in that case, the court explained: "In a case where the jury had also returned true findings of the lesser enhancements under section 12022.53, subdivisions (b) and (c), the striking of an enhancement under section 12022.53, subdivision (d) would leave intact the remaining findings, and an enhancement under the greatest of those provisions would be mandatory unless those findings were also stricken in the interests of justice." (*Morrison, supra,* 34 Cal.App.5th at p. 222; see also *People v. McDaniels*

18

(2018) 22 Cal.App.5th 420, 428 [noting that under section 12022.53, subdivision (h) and section 1385, the trial court had the "discretion to strike [a] firearm enhancement under section 12022.53, subdivision (d), . . . and then either impose time for one of the stayed lesser firearm enhancements [under subdivisions (b) and (c)] or strike them as well"].)

Nothing in the record suggests the trial court was unaware that striking the 25-year-to-life enhancement would leave the 20- and 10-year enhancements on the table. We presume the trial court knew and properly applied the governing law and conclude that remand is not required. (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1390 ["Absent evidence to the contrary, we presume that the trial court knew and applied the governing law"].)

### c. *Ineffective Assistance of Counsel*

MacDonald next argues his trial counsel was prejudicially deficient in failing to advocate for a lesser firearm enhancement. During the sentencing hearing, MacDonald's trial counsel specifically reminded the trial court of its "discretionary ability . . . to strike the gun enhancement under section 12022.53" and urged the court to consider "any discretionary relief that the court c[ould] offer." Thus, MacDonald's trial counsel expressly requested that the trial court exercise its discretion to strike the 25-year-to-life enhancement under section 12022.53, subdivision (d), and left the door open to the possibility that the court might impose a 10- or 20-year enhancement under subdivision (b) or (c). We cannot say that MacDonald's trial counsel rendered ineffective assistance in failing to specifically request one of the lesser enhancements.

"To succeed on an appellate claim of ineffective assistance, a defendant must establish that his trial counsel's performance was deficient and that his defense was prejudiced by the deficiency. [Citations.] 'The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' [Citation.] Whenever counsel's conduct can be reasonably attributed to sound strategy, a reviewing court will presume that the conduct

19

was the result of a competent tactical decision, and the defendant must overcome that presumption to establish ineffective assistance." (*People v. Fromuth* (2016) 2 Cal.App.5th 91, 113.)

MacDonald claims that his trial counsel could have had "no possible tactical justification" for failing to argue for a lesser enhancement. We disagree. MacDonald's trial counsel could have reasonably believed that MacDonald had most to gain by framing the trial court's exercise of discretion as an "all or nothing" choice between a 25-year-to-life enhancement and no enhancement at all. If the trial court was inclined to believe the 25-year-to-life enhancement was too harsh, the court might strike the enhancement entirely, reducing MacDonald's sentence for attempted murder from 39 years to life to 14 years to life. In contrast, an argument that the trial court could select one of the lesser enhancements might have produced a sentence of 24 years to life or 34 years to life. We cannot say that MacDonald's trial counsel acted unreasonably in pursuing a strategy designed at achieving the best possible outcome for his client, while leaving the door open for some lesser outcome. We therefore reject MacDonald's claim of ineffective assistance of counsel.

### 4. Custody Credits

Finally, MacDonald argues that he should receive two additional days of presentence custody credit, including the date of his arrest and the date of his sentencing. The People concede the issue and we accept the concession. (*People v. Denman* (2013) 218 Cal.App.4th 800, 814 ["Calculation of custody credit begins on the day of arrest and continues through the day of sentencing"].) MacDonald is entitled to presentence credit for actual time spent in custody through, and including, the date of his sentencing hearing. (*People v. Smith* (1989) 211 Cal.App.3d 523, 526.) The time between MacDonald's arrest, on February 8, 2017, and his sentencing hearing, on May 24, 2019, was 836 days. We shall therefore order the abstract of judgment modified to reflect 836 actual days of custody credit.

20

*B.      Gibson's Contentions*

Gibson contends: (1) the trial court should have instructed the jury on the lesser related offense of being an accessory after the fact; (2) the trial court should have instructed the jury on the lesser included offense of conspiracy to commit assault with a deadly weapon; (3) the trial court imposed an unauthorized sentence of "seven years to life" for her attempted murder conviction, rather than a sentence of "life with the possibility of parole after serving a minimum of seven years"; and (4) the trial court erred in imposing various fines and fees without determining her ability to pay.  We consider Gibson's contentions in order.

*1.      Accessory After the Fact*

Gibson contends the trial court erred in failing to instruct the jury sua sponte on the defense theory that she merely acted as an accessory after the fact.  She argues her testimony amounted to substantial evidence she was unaware that MacDonald intended to shoot Terrell, and only acted after the fact by accompanying MacDonald and failing to notify police.  We are not persuaded.

As Gibson acknowledges, accessory after the fact is a lesser related offense to attempted murder, and a trial court is not required to instruct the jury on lesser related offenses, even if requested.  (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 486; *People v. Birks* (1998) 19 Cal.4th 108, 112-113.)  Nonetheless, Gibson argues the instruction was necessary to elucidate her theory that she only became involved in the crimes after they were committed.  She further argues the failure to instruct on accessory after the fact deprived her of due process and interfered with her right to present a defense.  We disagree.

During closing argument, Gibson's trial counsel argued at length that Gibson's involvement in the crimes was limited to her post-shooting conduct of lying to police.  Counsel specifically argued that Gibson was an accessory after the fact, emphasizing that she could not be guilty of aiding and abetting attempted murder if she did not intend to

21

kill Terrell. Counsel's argument was sufficient to apprise the jury of Gibson's theory of the case. (See *People v. Whisenhunt* (2008) 44 Cal.4th 174, 213.)

Furthermore, the jury was instructed with CALCRIM No. 401, which made clear that the prosecution, in order to establish Gibson's guilt as an aider and abettor, was required to prove both that she formed the requisite intent "[b]efore or during the commission of the crime," and that her words or conduct aided and abetted the commission of the crime. CALCRIM No. 401 further informed the jury that "the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor." We presume the jury followed these instructions (*People v. Sanchez* (2001) 26 Cal.4th 834, 852), which clearly conveyed that Gibson could not be found guilty on an aiding and abetting theory based solely on her actions after the shooting. Under the circumstances, the trial court was not required to instruct the jury on the theory of accessory after the fact. (See *People v. Mora and Rangel, supra,* 5 Cal.5th at pp. 486-487; *People v. Whisenhunt, supra,* 44 Cal.4th at p. 213.)

Gibson argues that her trial counsel rendered ineffective assistance by failing to request an instruction on accessory after the fact. However, a trial court may not instruct a jury on a lesser related offense unless the prosecutor agrees to the instruction. (*People v. Birks, supra,* 19 Cal.4th at pp. 112-113.) Gibson clearly believes an instruction on accessory after the fact would have benefited her, but she presents no evidence or argument showing that the prosecutor would have agreed to such an instruction. In the absence of any such evidence or argument, we conclude that Gibson fails to show that trial counsel's performance was objectively unreasonable, and fails to show prejudice. (*People v. Lucas* (1995) 12 Cal.4th 415, 436; *People v. Fromuth, supra,* 2 Cal.App.5th at p. 113.) We therefore reject Gibson's claim of ineffective assistance as well.

### 2. *Conspiracy to Commit Assault with a Deadly Weapon*

Gibson next argues the trial court erred in failing to sua sponte instruct on the lesser included offense of conspiracy to commit assault with a deadly weapon. She raised the same argument in a motion for a new trial, which the trial court denied on the grounds that any error in failing to instruct the jury on a lesser included offense was harmless. We agree with the trial court.

There are two tests for determining whether a crime is a lesser included offense: the elements test and the accusatory pleading test. (*People v. Gonzalez* (2018) 5 Cal.5th 186, 197.) "Under the elements test, one offense is another's 'lesser included' counterpart if all the elements of the lesser offense are *also* elements of the greater offense. [Citation.] Under the accusatory pleading test, a crime is another's 'lesser included' offense if all of the elements of the lesser offense are also found in the *facts alleged* to support the greater offense in the accusatory pleading." (*Ibid.*) Under the accusatory pleading test, "we review the information to determine whether the accusatory pleading describes the crime . . . in such a way that if committed in the manner described, [the lesser] must necessarily be committed." (*People v. Moses* (1996) 43 Cal.App.4th 462, 470.)

The elements for the crime of conspiracy are " 'proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act "by one or more of the parties to such agreement" in furtherance of the conspiracy.' [Citation.]" (*People v. Russo* (2001) 25 Cal.4th 1124, 1131.) The prosecution must prove the commission of an overt act, but "the jury need not agree on a specific overt act as long as it unanimously finds beyond a reasonable doubt that some conspirator committed an overt act in furtherance of the conspiracy." (*Id.* at p. 1128.)

A conspiracy to commit murder does not require a firearm, so under the elements test, conspiracy to commit assault with a firearm is not a lesser included offense of conspiracy to commit murder. (*People v. Cook* (2001) 91 Cal.App.4th 910, 918-919 (*Cook*).) There is, however, a split of authority on the application of the accusatory pleading test in conspiracy cases. In *People v. Fenenbock* (1996) 46 Cal.App.4th 1688 (*Fenenbock*), the Court of Appeal for the First District, Division One, held that courts should not consider overt act allegations in determining whether a lesser included offense is necessarily included in the offense alleged to have been the target of the conspiracy. (*Id.* at p. 1707.) In *Cook,* by contrast, another panel of this court concluded that overt act allegations put the defendant on notice of the facts alleged and could be considered in determining whether conspiracy to commit assault with a firearm was a lesser included offense of conspiracy to commit murder. (*Cook, supra,* at pp. 914-915, 920; see also *People v. Cortez* (2018) 24 Cal.App.5th 807, 820 [agreeing with *Cook* "to the extent that the trial court may consider overt act allegations when determining whether sua sponte instruction on a lesser included conspiracy offense is required," but disagreeing with our conclusion that overt act allegations in that case warranted an instruction on the lesser included offense of conspiracy to commit assault with a firearm].) We need not take sides in the ongoing split of authority between *Fenenbock* and *Cook* (and *Cortez*), or attempt to parse the analyses in those cases, as we conclude that any error in failing to instruct on conspiracy to commit a lesser included offense was harmless in light of the jury's finding that Gibson was guilty of attempted willful, deliberate, and premeditated murder.

Failure to instruct sua sponte on a lesser included offense "is not subject to reversal unless an examination of the entire record establishes a reasonable possibility that the error affected the outcome." (*People v. Breverman* (1998) 19 Cal.4th 142, 165.) "Error in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to

defendant under other properly given instructions." (*People v. Lewis* (2001) 25 Cal.4th 610, 646.) This type of error is prejudicial "only if, 'after an examination of the entire cause, including the evidence' (Cal. Const., art. VI, § 13), it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred. (*Watson, supra*, 46 Cal.2d at p. 836)." (*People v. Breverman, supra*, at p. 178.)

By convicting MacDonald and Gibson in count one of the attempted willful, deliberate, and premeditated murder of Terrell, the jury necessarily found that each had the specific intent to kill required for conspiracy to commit murder, rather than some lesser intent. (*People v. Smith* (2005) 37 Cal.4th 733, 739 [" '[a]ttempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing' "]; *People v. Lee* (2003) 31 Cal.4th 613, 623.) The jury's verdict establishes that MacDonald and Gibson acted with the specific intent to kill, rather than an intent to commit some lesser offense.

We also conclude that any error was harmless given the strength of the conspiracy charge against MacDonald and Gibson. The evidence showed that MacDonald fired three shots at Terrell at close range and then drove away. The car then reversed and returned to Terrell, who was now limping down the street. He was then shot four more times. No reasonable juror could have found from the foregoing evidence that MacDonald and Gibson conspired only to frighten or wound Terrell, rather than kill him. To the extent jurors believed there was a conspiracy, they could not have rationally concluded that the object of the conspiracy was anything other than murder. It follows that any error in failing to instruct the jury on conspiracy to commit assault with a deadly weapon was harmless.

### 3. *Unauthorized Sentence*

The trial court sentenced Gibson to "seven years to life" for her conviction on count one (attempted murder) and stayed the sentence pursuant to section 654. Gibson

argues the sentence was unauthorized. She maintains she should have been sentenced to "life with the possibility of parole after serving a minimum of seven years," and urges us to remand with instructions to modify the sentence. We decline to do so.

Gibson correctly observes that the statutory sentence for willful, deliberate, and premeditated attempted murder is "life with the possibility of parole." (§ 664, subd. (a).) The sentence is indeterminate and does not contemplate a range. (*Ibid.*; see *People v. Felix* (2000) 22 Cal.4th 651, 659.) That said, a person sentenced to such a term cannot be paroled until she has served "at least seven calendar years" in prison. (§ 3046, subd. (a)(1).) Thus, sections 664, subdivision (a) and 3046, subdivision (a)(1) together contemplate an indeterminate life sentence with the possibility of parole after seven years, and not a minimum sentence of seven years. (See *People v. Robinson* (2014) 232 Cal.App.4th 69, 72, fn. 3 ["A term of life with the possibility of parole does not have a minimum determinate term of seven years; rather, a person sentenced to such a term first becomes eligible for parole in seven years"].)

Courts and practitioners alike commonly describe indeterminate life sentences with minimum parole eligibility periods in terms of "x years to life." (See, e.g., *People v. Caballero* (2012) 55 Cal.4th 262, 265 [sentence for attempted murder committed for the benefit of a criminal street gang (§§ 664, 187, subd. (a), 186.22, subd. (b)(1)(C)) expressed as "15 years to life"]; *People v. Garcia* (2017) 7 Cal.App.5th 941, 948 [explaining that "the trial court sentenced defendant to 35 years to life as follows: seven years to life for the attempted murder, plus a consecutive term of 25 years to life for the intentional discharge of a firearm enhancement, plus a consecutive term of three years for the great bodily injury enhancement"].) Our Supreme Court considered the practice of including the minimum term of imprisonment in the pronouncement of an indeterminate life sentence in *People v. Jefferson* (1999) 21 Cal.4th 86 (*Jefferson*), and determined that, "it is not improper for the trial court to include, as part of a defendant's sentence, the minimum term of confinement the defendant must serve before becoming eligible for

26

parole." (*Id.* at p. 101, fn. 3; and see *id.* at p. 99 ["section 3046 establishes a minimum term"].)

Although *Jefferson*'s brief discussion of the pronouncement of sentence was arguably dicta, our Supreme Court's dicta "should not be disregarded by an intermediate appellate court without a compelling reason." (*Lawler v. City of Redding* (1992) 7 Cal.App.4th 778, 784; see also *Howard Jarvis Taxpayers Assn. v. City of Fresno* (2005) 127 Cal.App.4th 914, 925 ["Even if the court's conclusions technically constitute dicta, we will not reject dicta of the Supreme Court without a compelling reason"].) No such reason has been offered here. Indeed, Gibson does not even discuss *Jefferson*, let alone attempt to distinguish it. We therefore follow *Jefferson* in concluding that the practice of describing indeterminate life sentences with minimum parole eligibility periods in terms of "x years to life" does not amount to error. Although it would have been more precise for the trial court to have imposed a sentence of life with the possibility of parole after seven years, the sentence here was "not improper" and communicated the significance of section 3046 in a way that could be easily understood by laypersons. (*Jefferson, supra,* 21 Cal.4th at p. 101, fn. 3.) Accordingly, we leave Gibson's sentence unchanged.

### 4. *Fines and Fees*

Finally, Gibson challenges the imposition of various fines and fees, including: a $1,000 restitution fine (§ 1202.4), a $90 court security fee (§ 1465.8), a $120 conviction assessment fee (Gov. Code, § 70373), a $402 main jail booking fee (Gov. Code, § 29550.2), and a $99 main jail classification fee (Gov. Code, § 29550.2).[5] Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), Gibson argues the trial court violated her constitutional rights by imposing these fines and fees without determining her ability to pay. The People respond that Gibson forfeited her *Dueñas* challenge by

---

[5] The trial court also imposed and suspended a $1,000 parole revocation fine. (§ 1202.45.)

27

failing to object in the trial court. We deem it unnecessary to reach the question of forfeiture, as we are not convinced that *Dueñas* was correctly decided.

Our Supreme Court is now poised to resolve this question, having granted review in *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted November 13, 2019, S257844, which agreed with the court's conclusion in *Dueñas* that due process requires the trial court to conduct an ability to pay hearing and ascertain a defendant's ability to pay before it imposes court facilities and court operations assessments under section 1456.8 and Government Code section 70373, but not restitution fines under section 1202.4. (*Kopp, supra,* at pp. 95-96.) In the meantime, we join those authorities that have concluded the principles of due process do not require determination of a defendant's present ability to pay before imposing the fines and assessments at issue in *Dueñas* and in this proceeding. (*People v. Kingston* (2019) 41 Cal.App.5th 272, 279; *People v. Hicks* (2019) 40 Cal.App.5th 320, 329, rev. granted Nov. 26, 2019, S258946; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1069; *People v. Caceres* (2019) 39 Cal.App.5th 917, 928.) Having done so, we reject Gibson's *Dueñas* challenge to the above-referenced fines and fees, and her derivative claim of ineffective assistance of counsel.

## III. DISPOSITION

We order MacDonald's presentence custody credit corrected to show 836 days of actual custody. The clerk of the superior court is ordered to file an amended abstract of judgment so reflecting and forward a copy to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

/S/

---

RENNER, J.

We concur:

/S/

---

HULL, Acting P. J.

/S/

---

DUARTE, J.