Filed 1/24/17; opn. after prior opn. vacated

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

THE PEOPLE,

 Plaintiff and Respondent,

v.

ANDREW EDWARD GARCIA,

 Defendant and Appellant.

E059452

(Super.Ct.No. INF1100102)

OPINION

APPEAL from the Superior Court of Riverside County.  Ronald L. Johnson, Judge.  (Retired judge of the Riverside Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed as modified, with directions.

Christopher A. Nalls, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton, Warren Williams and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant is serving 35 years to life after a jury convicted him as an adult of attempted murder and other charges for robbing and shooting a woman in the face when he was 15 years old.  In this appeal, defendant argues, the People concede, and we agree, that a three-year enhancement for great bodily harm under Penal Code section 12022.7[1] is unauthorized and should be stayed.  This reduces his sentence to 32 years to life.  Defendant also contends his overall sentence constitutes cruel and unusual punishment because the sentencing court did not comply with the requirements in *Miller v. Alabama* (2012) 567 U.S. ____ [132 S.Ct. 2455] (*Miller*) and *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*) that it consider his youth and consequent reduced culpability and impose a sentence reflecting these considerations.  While we recognize that considerations of defendant's youth did not, and by statute could not, play a major part in determining his sentence, the sentence passes constitutional muster because he "shall be eligible for release on parole by the board during his or her 25th year of incarceration at a youth offender parole hearing" pursuant to section 3051.  We affirm, with directions that the trial court determine whether defendant was afforded an adequate opportunity to make a record that complies with the requirements set forth in *People v. Franklin* (2016) 63 Cal.4th 261, 283-284.

**FACTS AND PROCEDURE**

At about 9:00 p.m. on January 27, 2011, Maria Mendiola went to one of the hair salons she owned, and at which she cut hair, to pick up the mail after closing.  She saw a

---

[1] All section references are to the Penal Code unless otherwise indicated.

male and female, whom she described as "kids" standing outside the salon hugging.  Ms. Mendiola picked up her mail from the mailbox and noticed the two approaching her as she returned to her parked truck, got in and started the engine.  As the two got closer, the male told Ms. Mendiola that he knew her, or that she knew him.[2]  As she got into her truck, the male lifted up his shirt, pulled a gun out of his waistband and pointed it at her.  The male told her to give him her purse.  When Ms. Mendiola tried to close the truck door, the male told the female to hold it open.

The male repeatedly yelled at Ms. Mendiola to give him her money, her cell phone and the keys to her truck.  Defendant said "Get off the truck.  Give me the keys.  Give me your purse. Give me the keys.  Get off, get off." Ms. Mendiola testified at trial that "I just thought he was going to kill me."  When she told the male she did not have any money, he took her cell phone from her hand and kept yelling at her to get out of the truck. Ms. Mendiola told the male that she was not going give him anything.  He said, "I'm going to shoot you.  I'm going to shoot you."  Ms. Mendiola said, "Well, shoot me."  The male then asked the female, "Do I shoot her?"  And the female said, "Yes."  The male turned to Ms. Mendiola and shot her in the face, just as she threw her head back.  Ms. Mendioloa heard the shot as a loud noise.  The bullet entered inside her mouth, struck her upper teeth, went through her cheek and lodged near her upper jaw.  She testified at trial that

---

[2]  Defendant told the probation officer that he had seen Ms. Mendiola two days before the offense when he knocked on the window of a business and asked to use the telephone.  Defendant said Ms. Mendiola "yelled at him and said she did not have a phone and to go away."

the gunshot made a "big noise. But I didn't feel like—I didn't think he shot me 'cause I was still, like, awake."

The two youths fled on foot. Ms. Mendiola followed them in her truck for about three minutes until they ran behind a building. While driving, Ms. Mendiola had been using her hand to wipe from her mouth what she thought was a large amount of saliva. However, she stopped when she realized she was bleeding from inside her mouth and all over her clothes. Ms. Mendiola saw so much of her own blood that she thought she would pass out. She also felt that she had a broken tooth. Ms. Mendiola stopped a passing van and told the driver she had been shot. She pointed out the direction in which the two youths had run and asked the driver to call police. She then drove to meet her husband, who was supposed to be at the nearby home of an acquaintance. Her husband arrived about five minutes later. The people at the home called police and an ambulance. The ambulance took her to the emergency room. Doctors removed fragments of a small-caliber bullet from her cheek. Ms. Mendiola lost several teeth from her upper jaw. At the time of trial the pain in her cheek had become a permanent numbness and she was still experiencing pain in her teeth. She later identified defendant from a series of photographs as the male who shot her. Defendant's fingerprints were found on the driver's side door of Ms. Mendiola's truck, just under the mirror.

In a complaint filed February 16, 2011, and an information filed March 15, 2011,

the People charged defendant as an adult under Welfare and Institutions Code, section 707, subdivision (d)(2)(B), because he was at least 14 years old and personally used a firearm during the commission or attempted commission of a felony.

On July 15, 2011, the jury found defendant guilty as charged of attempted first degree murder (§§ 664 & 187, subd. (a)) and robbery (§ 211). The jury found true allegations as to the attempted murder that defendant personally and intentionally discharged a firearm, causing great bodily injury (§ 12022.53, subd. (d)) and that he personally inflicted great bodily injury (§ 12022.7, subd. (a)). The court ordered the Probation Department to interview defendant and prepare a report for use at sentencing.

In a telephone interview, defendant told the probation officer that he used marijuana daily, drank alcohol every other week, and occasionally used cocaine and ecstasy. Defendant's parents were divorced when he was eight years old, after which they provided the defendant with counseling. Defendant did not get along well with his mother, with whom he initially lived. He described their relationship as "on and off" because he did not like to follow her rules. Defendant wanted to go to parties but she would not let him because of his age. Defendant dated adult women, and he was "embarrassed" that his mother would insist he leave open his bedroom door when he brought them home. Defendant described his relationship with his father as always good because his father understood the "boy thing." However, defendant had to leave his father's home at the request of father's previous girlfriend. Defendant then moved in with his grandmother, but moved back in with his father just prior to his arrest.

As to defendant's criminal history, he was twice arrested for drug possession and once returned home by police after he ran away. His single adjudicated offense was for arson, for lighting a tree on fire at a middle school, for which he received probation. In addition, since the attempted murder defendant had participated in three fights while in juvenile hall.

Regarding sentencing, defendant expressed the hope that he would receive a low sentence, such as ten years, and wished to serve it in a fire camp. He mentioned several times that he wanted to finish the "dog program" at juvenile hall.

Defendant told the probation officer that "I still see myself not guilty, even though to everyone else I am guilty." Defendant denied committing the offense and stated he did not think he should be in jail. He said that on the night of the offense he went out to eat with some friends, then went to his father's house and then his grandmother's house. Defendant was upset because he could no longer play football. He said he was mad at his girlfriend because her testimony had caused him to be incarcerated and to "have to deal with these politics." Defendant talked about his family and said regarding the victim, Ms. Mendiola, "I feel like she took me away from my family." He also stated "I'm not mad but I think she should have thought who she was sending to jail for his whole life." Defendant expressed reluctance to pay restitution to the victim, saying "I would be especially mad. I heard that her family is a drug family, so them taking money from my family, I'd be more than mad."

On December 23, 2011, the trial court sentenced defendant to 35 years to life as follows: seven years to life for the attempted murder, plus a consecutive term of 25 years to life for the intentional discharge of a firearm enhancement, plus a consecutive term of three years for the great bodily injury enhancement. The court stayed the sentence for robbery pursuant to section 654.

Before imposing the sentence, the court heard supporting statements from defendant's mother and from two of his freshman-year special education teachers. The court also heard a request from defense counsel that defendant be sentenced to the California Youth Authority (CYA) in accordance with the positive Amenability Determination by the Department of Juvenile Justice. In response to this defense counsel request, the court cited to Welfare and Institutions Code section 1732, which prohibits CYA commitments for certain serious crimes where the sentence exceeds 25 years. The court then commented, "While it would be appropriate and correct for Mr. Garcia to be housed in an age-appropriate facility, committing him to the juvenile detention does not appear to be an option that the court has." In the course of imposing the 35-years-to-life sentence the court at several points correctly described its lack of statutory authority to use personal information about defendant to craft the sentence: "[T]he court does not have much discretion, in all honesty, about how to proceed in this manner," "The court has very little leeway in applying those standards," and "It [the sentence imposed] is ordered by the Legislature and it's an order that I have been sworn to uphold, and I am therefore upholding it."

This appeal followed.

## DISCUSSION

1. *The Three-Year Enhancement Under Section 12022.7 Must Be Stayed*

Defendant argues the trial court imposed an unauthorized sentence when it imposed a consecutive three-year enhancement to the attempted murder conviction under section 12022.7, subdivision (a). The People concede and we agree. "An enhancement for great bodily injury as defined in Section 12022.7, 12022.8, or 12022.9 shall not be imposed on a person in addition to an enhancement imposed pursuant to subdivision (d)." (§ 12022.53, subd. (f).) Because the court also imposed the 25-years-to-life enhancement under section 12022.53, subdivision (d), for intentionally discharging a firearm with great bodily injury, the court should have stayed the three-year enhancement for great bodily injury under section 12022.7. This results in a new sentence of 32 years to life, to which we will now turn.

2. *Defendant's Non-Life Sentence Is Not Cruel and Unusual—He Has a Reasonable Chance for Release Well Within His Expected Lifetime*

Defendant argues the 32-years-to-life sentence violates his right to be free of cruel and unusual punishment guaranteed by the Eighth Amendment to the Federal Constitution ["Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."] and Article I, section 17 of the California Constitution ["Cruel or unusual punishment may not be inflicted or excessive fines imposed."].

8

Specifically, defendant argues that both the United States Supreme Court and the California Supreme Court have in recent years emphasized that juvenile offenders have special protection under the Eighth Amendment and are "less deserving of the most severe punishments" (*Graham v. Florida* (2010) 560 U.S. 48, 68 (*Graham*)) because they "'cannot with reliability be classified among the worst offenders.' [Citation.]" (*Ibid.*) Defendant points to *Roper v. Simmons* (2005) 543 U.S. 551, 569 (*Roper*) for its description of the three main reasons for this special protection and reduced culpability: (1) lack of maturity; (2) susceptibility to negative influences, including peer pressure; and (3) the fact that a youth's personality and character traits are still forming and are capable of change for the better. (*Id.* at pp. 569-570.)

We agree with the People that the cases upon which defendant relies involve sentences that are far harsher than his 32 years to life. The youthful defendant in *Roper* was sentenced to death. In both *Graham* and *Miller* the sentence was a life term without the possibility of parole. In *Caballero*, the term was 110 years to life, which the court found to be the functional equivalent of a life sentence without the possibility of parole. Each of these cases, which held that the challenged sentence was cruel and unusual when applied to a defendant charged as an adult who committed their crime while a minor, is relevant to the general discussion of the reasons for treating youthful offenders differently from adult offenders. However, none compels the result that defendant seeks here—a reduction of his sentence below the imposed 32 years to life. Here are the reasons why.

First, defendant's sentence is on its face neither an actual nor an effective life sentence without the possibility of parole. After 32 years, defendant will still be only approximately 47 years old, well within his life expectancy. To reiterate, in both *Graham* and *Miller*, the defendant received an actual life sentence without the possibility of parole. In *Caballero*, the defendant was sentenced to 110 years to life, by any measure an effective life sentence without possibility of parole. We cannot stress enough that this important factual difference renders each of the above cases inapplicable to defendant's sentence. By its terms, defendant's sentence will allow him to seek release when he is of middle age.

Second, even for sentences that are actual or effective life sentences, which defendant's emphatically is not, the recently enacted section 3051 guarantees defendant a youthful offender parole hearing after 25 years, when a 15-year-old offender would be approximately 40 years old. Section 3051, subdivision (b)(3), provides that a youth offender sentenced to a term of 25 years to life, "shall be eligible for release on parole by the board during his or her 25th year of incarceration at a youth offender parole hearing," unless otherwise released or eligible for an earlier parole hearing date under other provisions. At that time, the Board of Parole Hearings will "provide for a meaningful opportunity [for the youth offender] to obtain release" and "shall give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner in accordance with relevant case law." (§§ 3051, subd. (e), and 4801, subd. (c).) Section 3051 specifically

10

and sufficiently addresses these concerns regarding cruel and unusual punishment. This is because section 3051 has in effect abolished de facto life sentences in California. Section 3051 universally provides each juvenile offender convicted as an adult with a mandatory parole eligibility hearing on a legislatively specified schedule, and after no more than 25 years in prison. When the Legislature enacted section 3051, it followed precisely the urging of the *Caballero* court to provide this parole eligibility mechanism. The *Caballero* court interpreted *Graham* to require the trial courts to "impose a time when the juvenile offender will be able to seek parole from the parole board. The Board of Parole Hearings will then determine whether the juvenile offender must be released from prison 'based on demonstrated maturity and rehabilitation.' [Citation.]" (*Caballero, supra*, 55 Cal. 4th at p. 269.) In section 3051, the Legislation has imposed by statute that time when the juvenile offender may seek release from prison. In a footnote at the very end of the majority opinion, the *Caballero* court "urge[d] the Legislature to enact legislation establishing a parole eligibility mechanism that provides a defendant serving a de facto life sentence without possibility of parole for nonhomicide crimes that he or she committed as a juvenile with the opportunity to obtain release on a showing of rehabilitation and maturity." (*Caballero* at p. 269, fn. 5.) This is exactly what section 3051 does. Therefore, defendant's sentence of 32 years to life does not violate the Federal Constitution's prohibition against cruel and unusual punishment, as set forth in *Graham*, *Miller* and *Caballero*.

11

This analysis is consistent with the recent California Supreme Court decision in *People v. Franklin, supra,* 63 Cal.4th 268. In addition, the *Franklin* court recognized that, in order to fulfill the requirements of sections 3051 and 4801, the defendant "must be afforded sufficient opportunity to make a record of information relevant to his eventual youth offender parole hearing" at the time of sentencing. (*Franklin* at pp. 283-284.)

3. *Not Cruel and Unusual Under State Constitution*

We also conclude that the 32-years-to-life sentence is not cruel and unusual under the California Constitution. Section 12022.53 was enacted for the purpose of imposing """substantially longer prison sentences . . . on felons who use firearms in the commission of their crimes, in order to protect our citizens and to deter violent crime." [Citation.]'" (*People v. Gonzalez* (2008) 43 Cal.4th 1118, 1129.) Although it is the Legislature's role to define crimes and proscribe penalties for them, all statutory penalties are subject to the constitutional prohibition against cruel or unusual punishments contained in article I, section 17 of the California Constitution. (*People v. Dillon* (1983) 34 Cal.3d 441, 450 (*Dillon*), abrogated on another ground as stated in *People v. Chun* (2009) 45 Cal.4th 1172, 1186.) Such a violation occurs when a statutory punishment "'is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.'" (*Id*. at p. 478; accord, *In re Lynch* (1972) 8 Cal.3d 410, 424 (*Lynch*), superseded by statute on another ground, as stated in *People v. Caddick* (1984) 160 Cal.App.3d 46.) "[A] punishment is impermissible if it is

12

grossly disproportionate to the offense as defined or as committed, and/or to the individual culpability of the offender." (*Dillon*, at p. 450.)

Whether a punishment is cruel or unusual in violation of the California Constitution under the legal principles set forth in *Lynch* and *Dillon*, "presents a question of law subject to independent review; it is 'not a discretionary decision to which the appellate court must defer.' [Citation.]" (*People v. Felix* (2003) 108 Cal.App.4th 994 at pl.1000.) The reduction of a sentence based on the determination it is cruel or unusual under the California Constitution "'is a solemn power to be exercised sparingly only when, as a matter of law, the Constitution forbids what the sentencing law compels.' [Citation.]" (*Felix*, at p. 1000.) Furthermore, such a reduction "'"must be viewed as representing an exception rather than a general rule"'" and "'[i]n such cases the punishment is reduced because the Constitution compels reduction, not because a trial court in its discretion believes the punishment too severe.' [Citation.]" (*Ibid.*)

"'Our Supreme Court has emphasized "the considerable burden a defendant must overcome in challenging a penalty as cruel or unusual. The doctrine of separation of powers is firmly entrenched in the law of California, and a court should not lightly encroach on matters which are uniquely in the domain of the Legislature. Perhaps foremost among these are the definition of crime and the determination of punishment. While these intrinsically legislative functions are circumscribed by the constitutional limits of article I, section 17 [of the California Constitution], the validity of enactments will not be questioned 'unless their unconstitutionality clearly, positively, and

unmistakably appears.'" [Citation.]' [Citation.]" (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 569.)

In *Lynch, supra*, 8 Cal.3d 410, the California Supreme Court identified three analytical "techniques" a court must use to determine whether a punishment is disproportionate to the crime: (1) the court considers the nature of the offense and the offender "with particular regard to the degree of danger both present to society"; (2) the punishment imposed with the punishments for more serious crimes in the same jurisdiction; and (3) the court compares the punishment imposed with punishments for the same crimes in different jurisdictions. (*Id.* at pp. 425-427; see *Dillon, supra*, 34 Cal.3d at pp. 479-482.) A punishment need not be disproportionate under all three techniques to violate the California Constitution. (*Dillon*, at p. 487, fn. 38.) In his briefing, defendant addresses only the nature of the offense and the offender.

In assessing proportionality, courts must examine "'the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society.' [Citation.]" (*Dillon, supra*, 34 Cal.3d at p. 479.) Factors surrounding the nature of the offense include the defendant's motive, the way the crime was committed, the extent of the defendant's involvement, the manner in which the crime was committed, and the consequences of his acts. (*Id.* at p. 479; *Felix, supra*, 108 Cal.App.4th at p. 1000; *People v. Wallace* (2008) 44 Cal.4th 1032, 1099.) Factors regarding the nature of the offender include his "age, prior criminality, personal characteristics, and state of mind." (*Dillon* at p. 479; see *Felix* at p. 1000.) "[A] punishment which is not disproportionate in

14

the abstract is nevertheless constitutionally impermissible if it is disproportionate to the defendant's individual culpability." (*Dillon*, at p. 480.)

Here, the sentence was not cruel or unusual in light of the nature of the charged offense. Defendant shot the victim in the head at very close range. The victim is extremely lucky not to have been killed, which we attribute only to her having moved her head back just before defendant shot her. Nevertheless, the victim lost several teeth and at the time of trial still experienced numbness on the side of her face. Defendant engaged in quite violent conduct with a firearm for the simple motive of robbing the victim of her cell phone, purse, and vehicle.

In *Felix*, *supra*, 108 Cal.App.4th at page 1000, the defendant threatened but did not shoot the victim with a firearm to commit a carjacking. The defendant unsuccessfully argued that the imposition of the section 12022.53 subdivision (b), 10-year enhancement term was cruel or unusual. The appellate court stated: "This statutory provision punishes the perpetrator of one of the specified crimes more severely for introducing a firearm into a situation which, by the nature of the crime, is already dangerous and increases the chances of violence and bodily injury. We conclude nothing in the nature of the offense or how it was committed allows striking the mandatory enhancement as cruel or unusual." (*Felix*, *supra*, 108 Cal.App.4th at p. 1001.) The difference between *Felix* and the present case is that the *Felix* defendant received a ten-year enhancement for merely threatening the victim with a gun, whereas defendant here received a 25-years-to-life enhancement for using the gun to shoot the victim in the head. In both cases, the

defendant used the gun to increase both the danger of the crime and the risk of bodily injury.

Nor are we persuaded that the sentence is grossly disproportionate to defendant's individual culpability based on his personal characteristics. Here, defendant had turned 15 years old just 12 days before committing the offense, which could be a positive in defendant's favor. However, although defendant did not have a long history of criminal activity at that point, he showed serious signs of rebelliousness and unwillingness to abide by the law, or by rules at home. Defendant had already been on juvenile probation for arson, been arrested twice for drug possession, had been brought home by the police at age 14 after running away from home, and had began using drugs at a young age. Defendant indicated his relationship with his mother was "on and off" because she would not let him go out to parties and established rules in her home about him having adult women over. More important in terms of culpability, the probation officer noted in the probation report that defendant showed no remorse, stressed how the shooting had impacted him and his family, and expressed anger at the victim rather than sorrow at the injury he had caused her. Regarding the victim, the defendant told the probation officer, "I'm not mad but I think she should have thought who she was sending to jail for his whole life." Defendant was angry about the possibility of paying restitution to the victim, commenting "I would be especially mad. I heard that her family is a drug family, so them taking money from my family, I'd be more than mad." Defendant also blamed his girlfriend for testifying against him. Defendant's complete failure to take responsibility

for having committed this horrific crime that only by a miracle[3] failed to cause the victim's death increases his individual culpability for the crime.

Defendant does not contend his sentence is disproportionate to the punishments for more serious crimes in the same jurisdiction or to punishments for the same crimes in different jurisdictions, so we will not address those considerations in the *Lynch* analysis.

Notwithstanding defendant's youth, the fact remains he personally used a loaded firearm at close range to commit the attempted murder, and it is only by chance that he did not kill the victim. The total sentence of 32 years to life was not grossly disproportionate to defendant's crimes, regardless of his age. Defendant was the direct perpetrator; he had the intent to kill, for a fairly trivial reason; and he used a firearm. "Life sentences pass constitutional muster [even] for those convicted of aiding and abetting murder, and for those guilty of felony murder who did not intend to kill. [Citations.] . . . [T]he Legislature has determined that a significant increase in punishment is necessary and appropriate to protect citizens and deter violent crime. [Citations.]" (*People v. Em* (2009) 171 Cal.App.4th 964, 972-973.) We cannot say the California Constitution compels the reduction of this sentence.

### DISPOSITION

The judgment is modified to stay execution of the three-year enhancement imposed pursuant to section 12022.7, subdivision (a). As modified the judgment is

---

**3** At sentencing the judge commented, "You are lucky in one sense, that the victim in this case did not die and was not more seriously injured. However, that was just an intervention by an angel on your behalf."

17

affirmed. We remand to the trial court for the limited purpose of determining whether defendant was afforded an adequate opportunity to make a record of information that will be relevant to the California Board of Parole Hearings as it fulfills its statutory obligations under sections 3051 and 4801.

CERTIFIED FOR PUBLICATION

RAMIREZ
P. J.


We concur:

MILLER
J.

CODRINGTON
J.