Filed 9/28/23  P. v. Gutierrez CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E079351 |
| v. | (Super.Ct.No. RIF1900442) |
| MARCO RODRIGUEZ GUTIERREZ, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Benard Schwartz, Judge.  Affirmed.

James M. Crawford, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant and appellant Marco Gutierrez was convicted of 19 sex crimes committed over several years against his girlfriend's daughter, Jane Doe. On appeal, he argues that (1) there was insufficient evidence of force, violence, duress, menace, or fear of immediate and unlawful bodily injury for the 12 counts that require it; (2) the jury was erroneously instructed on Child Sexual Abuse Accommodation Syndrome; (3) the sentencing court could not impose fully consecutive counts without a certain jury finding; and (4) his sentence of 105 years plus 75 years to life constitutes cruel and unusual punishment. We affirm.[1]

## I. BACKGROUND

Gutierrez began living with his girlfriend and Doe in Moreno Valley when Doe was five or six years old. Gutierrez helped pay bills, took Doe to school or soccer practice, and enforced household rules, such as making Doe give Gutierrez her cell phone every night. Although Gutierrez is not Doe's biological father, Doe called him "dad."

One day, when Doe was six, Gutierrez placed his hand over Doe's vagina on top of her clothing. Gutierrez put his finger to his lips to "shush" her and tell her to be quiet. From then, until Doe was 16, Gutierrez "touched" her approximately three times a month. Gutierrez would remove Doe's clothing and underwear and digitally penetrate her vagina. Also three times a month, Gutierrez made Doe grab his penis and "play" with it until he ejaculated. Gutierrez would frequently orally copulate Doe. Gutierrez would also make Doe orally copulate him, pulling her hair up and down to direct her head. Doe was

---

[1] Undesignated statutory references are to the Penal Code.

sometimes able to push away, but when she did, Gutierrez would "aggressively" pull her back toward him, such as by grabbing her arm, pulling her hair, or pulling her shirt. Gutierrez often showed Doe pornography on his phone, telling her to do "whatever the girl was doing on the guy" so that she could learn how to do the same.

Once, when Doe was 14 years old and her mother was at work, Gutierrez brought Doe into his room and locked it. Gutierrez removed her clothes, orally copulated her, and then vaginally penetrated Doe with the tip of his penis. Before he inserted his penis, Doe tried to push Gutierrez off, but he ignored her. After he inserted, Doe pushed Gutierrez off, went to the bathroom, cried, and noticed that she was bleeding from her vagina. She then wiped herself, went to her room, and covered herself with a blanket.

Gutierrez frequently told Doe to "keep quiet":

"Q. What kind of things would he tell you?

"A. That he'd hurt my mom or my older sisters.

"Q. At any point, did he say that he would do anything other than hurt you or your family?

"A. Yes.

"Q. What would he say?

"A. That he could have my sisters killed and chopped into pieces and delivered to my house in a box.

"Q. Did he ever threaten he had people that would help him in doing this?

"A. Yes.

3

"Q. Did he ever make threats that if he got caught, you told someone, when he got caught, of what he would do?

"A. Yes.

"Q. What would he tell you?

"A. That the cops wouldn't do anything, that he would only get two to three years, and he would find me or he'll contact somebody – where my family lives.

"Q. Now, at some point, throughout this time that he would make these statements to you, did you believe him to be telling you the truth?

"A. Yes.

"Q. Did you believe him to be capable of carrying out those threats?

"A. Yes.

"Q. Were you fearful of what he would do if you told someone?

"A. Yes."

The last incident occurred when Doe was 15 or 16. Gutierrez arrived home drunk and tried to throw himself on her while she was in bed. He tried touching her under her clothes, but she scooted away and pushed back, and he eventually left the room. The next day, Doe told her boyfriend about Gutierrez's abuse, who encouraged her to report it. Some time later, she told her older sister, who called the police. Doe was interviewed by police twice that day, once at school and once at the station.

An investigator set up and recorded two pretext calls between Doe and Gutierrez. The calls were played at trial, and translated transcripts of the calls were entered into evidence.

During the first call, Doe asked Gutierrez what he "like[d] the most," but Gutierrez declined to answer, stating that he was worried that Doe could be "setting a trap." Doe asked again, and Gutierrez said he liked the "lips," and when Doe asked for another response, Gutierrez said "[e]verything" and "[t]he ones down there." Later, when referring to Doe's rear, Gutierrez said, "I would lick yours, I would suckle on yours real nice." When Doe asked, "[d]o you like to lick me down there," Gutierrez replied, "[m]m-hm," and when Doe asked "[d]id you like how I sucked the pecker," Gutierrez said "[y]es." When Gutierrez asked, "[w]hy didn't you ever send me pictures of what I asked you for," Doe eventually replied it was because she never had her phone at night when she showered because it was always taken away, to which Gutierrez replied, "OK, today I'll let you keep it." During the second call, Doe asks Gutierrez, "if we go to a hotel, like you said, are we gonna make love again," to which Gutierrez replied, "[m]m-hm."

After the pretext calls, investigators brought Gutierrez to the station. During his interrogation, which was played at trial, Gutierrez admitted to several sexual acts with Doe, including touching her inside the vagina "fifteen, twenty times," orally copulating her the same number of times, showing her pornography, having her copulate him

5

"around" "ten or eleven times," masturbating in front of her, and attempting to vaginally penetrate her with his penis "three or four times."

Gutierrez was charged with five counts of oral copulation or sexual penetration of a child 10 years of age or younger (§ 288.7, subd. (b); counts 1-5), three counts of sexual penetration of a child under the age of 14 years by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury (§ 289, subd. (a)(1)(B); counts 6-8), two counts of sexual penetration of a minor 14 years or older by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury (§ 289, subd. (a)(1)(C); counts 9-10), rape of a minor 14 years or older (§ 264, subd. (c)(2); count 11), eight counts of lewd and lascivious act on a child under 14 by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury (§ 288, subd. (b)(1); counts 12-19), and two counts of lewd and lascivious act on a child 14 or 15 years old and more than 10 years younger than the defendant (§ 288, subd. (c)(1); counts 20-21). Following a trial, a jury found Gutierrez guilty on all counts except counts 9 and 10, for which the jury was hung and a mistrial declared. The trial court sentenced Gutierrez to a determinate sentence of 105 years and 8 months to run consecutively to an indeterminate sentence of 75 years to life.

## II. DISCUSSION

### A. *Sufficiency of the Evidence*

Gutierrez challenges the 12 counts where the crime he was convicted of required that it be accomplished by means or use of "force, violence, duress, menace, or fear of

6

immediate and unlawful bodily injury" on the victim or another, arguing that there was insufficient evidence of any such means.[2] This included counts 6 through 8 (sexual penetration of child under 14, § 289, subd. (a)(1)(B)), 11 (rape of child 14 or older, § 264, subd. (c)(2)), and 12 through 19 (lewd or lascivious act on child under 14, § 288, subd. (b)(1)).

In reviewing a challenge to the sufficiency of the evidence, "we must '"review the entire record in the light most favorable to the judgment,"' and then determine whether it contains '"evidence that is reasonable, credible, and of solid value"' such that a reasonable jury could have found the defendant guilty beyond a reasonable doubt." (*People v. Ware* (2022) 14 Cal.5th 151, 167.) We "'"presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence . . . ' . . . for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.'"'" (*Ibid.*)

Here, the evidence was sufficient to show that Gutierrez committed each of the crimes using duress. In this context, duress means "'a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted.'"

---

[2] Gutierrez contests the sufficiency of the evidence as to 14 counts, but this includes the two counts he was not convicted on.

(*People v. Leal* (2004) 33 Cal.4th 999, 1004, italics removed; see also § 261, subd. (b)(1).) In addition, where, as here, "'the defendant is a family member and the victim is young . . . the position of dominance and authority of the defendant and his continuous exploitation of the victim' is relevant to the existence of duress." (*People v. Schulz* (1992) 2 Cal.App.4th 999, 1005.)

Doe testified that Gutierrez molested her about "three times a month" from when she was six to 16 years old. Gutierrez would tell her to "keep quiet," adding that if she said something, he would hurt her mom or sisters. He told her that if he were caught by the police, the police would not do anything and that they would just lock him up for "two to three years," after which he would look for Doe. Doe testified that Gutierrez made such threats regularly. And Gutierrez made clear how he would retaliate against Doe: he would "have [her] sisters killed and chopped into pieces and delivered to [her] house in a box." Doe testified that she believed Gutierrez to be capable of carrying out such threats, and that as a result, she was fearful of reporting the abuse.

In light of Doe's testimony, together with Gutierrez's role as a family member, and Doe's very young age when Gutierrez began molesting her, the evidence was more than sufficient for a finding of duress. Indeed, Gutierrez's contention that the threats "were not sufficient to cause a reasonable person to do something that he or she would not otherwise do" borders on absurd. An express threat of dismembering family members, made by someone who had regular access to those family members, is sufficient to coerce a reasonable person. (*Cf.* Sam v. Commonwealth (Va. Ct. App. 1991)

8

13 Va.App. 312, 323 ["Human experience demonstrates that individuals often are more willing to subject themselves to great risks when a loved one is threatened with harm than when threatened with harm themselves"].) Indeed, the threats of violence here were far more serious than evidence deemed sufficient in other sex abuse cases. (See *People v. Barton* (2020) 56 Cal.App.5th 496, 518 [sufficient evidence of duress where victim was "dependent on" defendant, the victim's instructor at a military school, and defendant "was able to establish himself as an important 'father figure' in [victim's] life with the ability to strongly influence [the victim's] mother"].) Gutierrez also relies on *People v. Espinoza* (2002) 95 Cal.App.4th 1287, but that case is distinguishable. As this court has noted, "in *Espinoza* the only proffered basis for the victim's fear was that the defendant continued to molest her." (*People v. Thomas* (2017) 15 Cal.App.5th 1063, 1073; see *Espinoza*, *supra*, at p. 1321 ["no evidence was introduced to show that [the victim's] fear was based on anything defendant had done other than to continue to molest her"].) Doe's fear here was not limited to only the fear of continued molestation. It was instead based on a fear of violent retribution. And Gutierrez's argument that Doe's delayed disclosure of the abuse cannot establish duress, even if assumed true, is beside the point, because duress was sufficiently shown here by other means.

In addition, the evidence was sufficient for a finding that Gutierrez used force for the rape and lewd and lascivious act counts (counts 11 and 12 through 19, respectively).[3]

---

[3] The prosecution's closing argument did not focus on force for the sexual penetration counts (counts 6 through 8), and the People do not contend that Gutierrez used force for these counts in its respondent's brief.

9

For rape, "'the prosecution need only show the defendant used physical force of a degree sufficient to support a finding that the act of sexual intercourse was against the will of the [victim].'" (*People v. Griffin* (2004) 33 Cal.4th 1015, 1023-1024.) For lewd acts, the force must be "'substantially different from or substantially greater than that necessary to accomplish the lewd act itself.'" (*People v. Soto* (2011) 51 Cal.4th 229, 242.) The evidence for rape count, which based on the incident where Gutierrez inserted his penis into Doe's vagina before she ran away, supported a finding of force because Doe testified that she unsuccessfully tried to push Gutierrez off. And the evidence for the lewd and lascivious act counts, for which the prosecutor said to the jury during closing arguments that "you have an abundance of evidence before you[] of different touchings that meet the requirements for this crime," similarly supported a finding of force. Doe testified that when Gutierrez would have her orally copulate him, she would "tr[y] to push off," but he would "aggressively" pull her back towards him, such as by grabbing her arm, pulling her hair, or pulling her shirt.

Accordingly, we reject Gutierrez's challenge to the sufficiency of the evidence.

B.  *Jury Instruction*

Gutierrez contends that the trial court erred by instructing the jury with CALCRIM No. 1193, the pattern instruction on Child Sexual Abuse Accommodation Syndrome (CSAAS) testimony. To Gutierrez, the instruction improperly allowed the jury to consider CSAAS testimony, here in the form of an expert witness's testimony, as direct evidence of Gutierrez's guilt. We find the contention meritless.

10

At trial, Jody Ward, a clinical and forensic psychologist, testified about CSAAS. Ward stated that CSAAS has five components: secrecy, helplessness, entrapment and accommodation, delayed unconvincing disclosure, and retraction or recantation. Ward stated: "Not all children exhibit all of these behaviors, but many children exhibit some. And it helps us, as therapists, as lay people, really just as adults, to understand why children do what they do in response to sexual abuse that occurs within an ongoing relationship. Because many times these behaviors are counterintuitive or not what we would expect." When asked, "Are you here to tell us whether or not the defendant committed these crimes that he's charged with?" Ward replied no. Similarly, when asked by Gutierrez's counsel, "do you have any personal knowledge if the victim in this case is an honest person?" and "[d]o you have any personal knowledge as to whether or not the victim in this case exaggerates at times?" Ward replied, "I have no idea" and "I don't know," respectively.

As given to the jury, the instruction stated: "You have heard testimony from Doctor Jody Ward regarding child sexual abuse accommodation syndrome. [¶] Doctor Ward's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or nor [Doe's] conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony."

11

"We review instructional error claims under a de novo standard of review. [Citation.] 'The proper test for judging the adequacy of instructions is to decide whether the trial court "fully and fairly instructed on the applicable law . . . ."'" (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 175 (*Lapenias*).)

In the closely related context of rape trauma syndrome, our Supreme Court has held that testimony on rape trauma syndrome "is inadmissible when offered to prove that the complaining witness has in fact been raped" but "is admissible to rehabilitate the complaining witness when the defendant impeaches her credibility by suggesting that her conduct after the incident—e.g., a delay in reporting—is inconsistent with her testimony that she was raped." (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300 (*McAlpin*), discussing *People v. Bledsoe* (1984) 36 Cal.3d 236 (*Bledsoe*).) Although the Court has not expressly extended this reasoning to CSAAS testimony, it has cited with approval the many Court of Appeal cases that have done so. (*McAlpin*, *supra*, at pp. 1300-1301 & fn. 4.)

Gutierrez contends that using CSAAS evidence for permissible purposes and using it for impermissible ones is "a distinction without a difference." As he puts it, where, as here, the victim's testimony is the "majority" of the prosecution's case, there is no practical distinction between stating that the victim is believable and that the victim's claims are true. A jury still may evaluate the credibility of a victim's testimony, however, and reject it in whole or in part. Claiming that there is no difference between the permissible and impermissible uses of the testimony challenges the propriety of

12

CSAAS evidence in trials in general, an argument that is foreclosed by precedent. We see no reason why our Supreme Court's holding on rape trauma syndrome evidence would not apply with equal force to CSAAS evidence, and Gutierrez has provided none. (See *People v. Bowker* (1988) 203 Cal.App.3d 385, 391-392 ["no basis" to "rationally distinguish CSAAS from . . . rape trauma syndrome" for purposes of impermissible uses of testimony].)

Gutierrez also claims that the instruction as given violates *People v. Housley* (1992) 6 Cal.App.4th 947, 959 (*Housley*), where the Court of Appeal held that "the jury must sua sponte be instructed that . . . the expert's testimony [on CSAAS] is not intended and should not be used to determine whether the victim's molestation claim is true." However, the instruction here did that: it instructed the jury that Ward's testimony "is not evidence that the defendant committed any of the crimes charged against him." That the instruction did not repeat *Housley*'s instruction verbatim is not a sufficient basis to find error.

In sum, we find no error in the instruction, just as the other courts to have considered instructions based on CALCRIM No. 1193 have concluded. (See *People v. Gonzales* (2017) 16 Cal.App.5th 494; *People v. Munch* (2020) 52 Cal.App.5th 464; *Lapenias*, *supra*, 67 Cal.App.5th at pp. 175-176.)[4]

---

[4] Even if there were error, it is not reasonably probable that the error affected the judgment. (See *Bledsoe*, *supra*, 36 Cal.3d at pp. 251-252 [analyzing harmlessness under *People v. Watson* (1956) 46 Cal.2d 818]; *Housley*, *supra*, 6 Cal.App.4th at p. 959 [same].) Contrary to Gutierrez's appellate claim that "[n]o witnesses or physical evidence corroborated [Doe's] story," Gutierrez admitted to dozens of sexual acts with

*[footnote continued on next page]*

## C. Consecutive Sentences

Gutierrez next contends that his rights to due process and a jury trial were violated when the trial court imposed fully consecutive sentences without a jury finding that the offenses were committed against separate victims or the same victim on separate occasions.  At the time Gutierrez submitted his opening brief on appeal, the issue was pending before our Supreme Court.  Since then, however, the Court has decided the issue against him.  In *People v. Catarino* (2023) 14 Cal.5th 748, the Court held that section 667.6, subdivision (d), which requires a sentencing court to impose "'full, separate, and consecutive term[s]'" for certain sex crimes if "'the crimes involve separate victims or involve the same victim on separate occasions,'" complies with the Sixth Amendment. (*Catarino*, *supra*, at pp. 750, 755.)  Accordingly, we reject Gutierrez's claim.

## D. Cruel and Unusual Punishment

Lastly, Gutierrez contends that his sentence of 105 years and 8 months plus 75 years to life constitutes cruel and unusual punishment under the United States and California Constitutions.  We disagree.

The Eighth Amendment to the United States Constitution states:  "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  (U.S. Const., 8th Amend.)  "The concept of proportionality is central to the Eighth Amendment," and cases addressing it "underscore the essential principle that,

---

Doe during his interrogation, which was played at trial.  As Gutierrez himself states elsewhere in his opening brief on appeal, "[i]t is undisputed that [he] engaged in prohibited sex acts with Doe."

14

under the Eighth Amendment, the State must respect the human attributes even of those who have committed serious crimes." (*Graham v. Florida* (2010) 560 U.S. 48, 59 (*Graham*).) Similarly, the California Constitution provides: "Cruel or unusual punishment may not be inflicted or excessive fines imposed." (Cal. Const., art. I, § 17.)

The framework of analysis under the United States and California Constitutions are by and large the same. Under the Eighth Amendment, "challenges to the length of term-of-years sentences" are reviewed by first "comparing the gravity of the offense and the severity of the sentence." (*Graham*, *supra*, 560 U.S. at pp. 59-60, discussing *Harmelin v. Michigan* (1991) 501 U.S. 957.) "'[I]n the rare case in which [this] threshold comparison . . . leads to an inference of gross disproportionality' the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions. [Citation.] If this comparative analysis 'validate[s] an initial judgment that [the] sentence is grossly disproportionate,' the sentence is cruel and unusual." (*Id.* at p. 60.)

Similarly, "[u]nder the California Constitution, we use a three-pronged test to determine whether a particular sentence is disproportionate to the offense for which it is imposed. First, we examine 'the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society.' (*In re Lynch* (1972) 8 Cal.3d 410, 425 [105 Cal.Rptr. 217, 503 P.2d 921] [(*Lynch*)]. Second, we compare the punishment imposed with punishments prescribed by California law for more serious offenses. (*Id.* at

15

pp. 426-427.)  Third, we compare the punishment imposed with punishments prescribed by other jurisdictions for the same offense.  (*Id.* at pp. 427-429.)"  (*People v. Em* (2009) 171 Cal.App.4th 964, 972; see also *People v. Garcia* (2017) 7 Cal.App.5th 941, 952 [describing the "three analytical techniques" under *Lynch*].)  A lengthy sentence is cruel and unusual under the California Constitution if "it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity."  (*Lynch*, *supra*, at p. 424.)

Thus, under both the federal and the state frameworks, we consider the gravity or nature of the offense and engage in a comparative analysis.  The two differ in that, under the federal inquiry, we proceed to the comparative analysis only if the "'threshold'" analysis concerning the gravity of the offense "'leads to an inference of gross disproportionality'" (*Graham*, *supra*, 560 U.S. at p. 60), whereas the state inquiry always involves the comparative analysis.

"Whether a punishment is cruel or unusual is a question of law for the appellate court, but the underlying disputed facts must be viewed in the light most favorable to the judgment."  (*People v. Martinez* (1999) 76 Cal.App.4th 489, 496 (*Martinez*).)  Additionally, the doctrine of separation of powers requires significant deference to matters "which are uniquely in the domain of the Legislature," which include "the definition of crime and the determination of punishment."  (*People v. Wingo* (1975) 14 Cal.3d 169, 174.)  "Only in the rarest of cases could a court declare that the length of a

sentence mandated by the Legislature is unconstitutionally excessive." (*Martinez*, at p. 494.)

Here, although the sentence is severe, so too is the gravity of the offense. Over the course of a decade, Gutierrez repeatedly molested a young child who looked up to him as her father. He used his position of trust in the family to gain access to her, and he used graphic threats of violence to prevent her from telling anyone about the abuse. Even someone without a criminal history who commits such actions is a grave danger to society. (*See People v. Gonzales* (2001) 87 Cal.App.4th 1, 17 ["The lack of a significant prior criminal record is not determinative in a cruel and unusual punishment analysis"].) The comparison between the crime and the sentence does not "'lead[] to an inference of gross disproportionality'" (*Graham*, *supra*, 560 U.S. at p. 60), so the federal claim fails at this threshold stage.

A comparative analysis also does not help Gutierrez. "Along a spectrum ranging from murder, mayhem and torture on one end to petty theft on the other, 'lewd conduct on a child may not be the most grave of all offenses, but its seriousness is considerable.'" (*People v. Baker* (2018) 20 Cal.App.5th 711, 724-725.) "It is well within the prerogative of the Legislature to determine that sex offenses against young children are deserving of longer sentences than sex offenses against adults or nonsex offenses." (*People v. Gomez* (2018) 30 Cal.App.5th 493, 502.) In the context of sex crimes against children, California courts have repeatedly found no constitutional infirmity in sentences of similar magnitude to Gutierrez's. (E.g., *People v. Johnson* (2023) 88 Cal.App.5th 487, 494, 506-

17

507 [32 years plus 135 years to life; no prior criminal record], disapproved on other grounds by *Catarino*, *supra*, 14 Cal.5th at p. 757; *People v. Bestelmeyer* (1985) 166 Cal.App.3d 520, 530 [129 year sentence; no prior criminal record or evidence that "anyone other than his stepdaughter" was victimized].)  And Gutierrez does not attempt to demonstrate that a comparison of his punishment with punishment for the same offenses in other states weighs in his favor.  Indeed, he does not attempt to engage in a comparative analysis at all.

Citing a concurring opinion from a Justice of our Supreme Court, Gutierrez contends that his sentence is cruel and unusual because he cannot conceivably complete it.  (See *People v. Deloza* (1998) 18 Cal.4th 585, 600 (conc. opn. of Mosk, J.) [111 year sentence was cruel and unusual because it is "impossible for a human being to serve"].)  However, "'no opinion has value as a precedent on points as to which there is no agreement of a majority of the court,'" and "[b]ecause no other justice on our Supreme Court joined in Justice Mosk's concurring opinion, it has no precedential value." (*People v. Byrd* (2001) 89 Cal.App.4th 1373, 1383; see also *ibid.* [upholding sentence of 115 years plus 444 years to life and noting that impositions of a life sentence without the possibility of parole do not constitute cruel or unusual punishment under the United States or California Constitutions].)

In short, to the extent there is any arguable degree of disproportionality in Gutierrez's sentence, we are not persuaded that it rises to the level of "shock[ing] the conscience" or "offend[ing] fundamental notions of human dignity."  (*Lynch*, *supra*, 8

18

Cal.3d at p. 424.)  This is not one of those "rarest of cases" in which we could "declare that the length of a sentence mandated by the Legislature is unconstitutionally excessive." (*Martinez*, *supra*, 76 Cal.App.4th at p. 494.)  Gutierrez's contention that he has been subjected to cruel and unusual punishment is without merit.

## III.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL _____
J.

We concur:

RAMIREZ _____
P. J.

FIELDS _____
J.